# 24-1064(L), 24-1065

# United States Court of Appeals

## for the

# Fourth Circuit

IN RE: MARRIOTT INTERNATIONAL CUSTOMER DATA
SECURITY BREACH LITIGATION

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT
MDL NO. 19-MD-2879 (BAILEY, J.)

# REDACTED BRIEF OF APPELLEES

Robert H. Klonoff
10101 S. Terwilliger Boulevard
Portland, Oregon 97219
(503) 702-0218
klonoff@usa.net

Samuel Issacharoff
40 Washington Sq.
New York, New York 10012
(212) 998-6580
sil3@nyu.edu

*Counsel for Appellees*
*(Additional counsel listed on signature page)*



COUNSEL PRESS    (800) 4-APPEAL • (JOB 329113)

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Appellees certify that they are all natural persons.

## TABLE OF CONTENTS

Page

CORPORATE DISCLOSURE STATEMENT ....................................................... i

INTRODUCTION ................................................................................................1

I.     STATEMENT OF THE FACTS ...................................................................4

     A.     Background of the Litigation ...............................................4

     B.     Bellwether Claims ...............................................................6

     C.     SPG Program and Terms......................................................7

     D.     Facts Relating to Waiver of the Choice of Law and Venue Provision............................................................................8

     E.     District Court Rulings ........................................................11

SUMMARY OF ARGUMENT ...............................................................................28

STANDARD OF REVIEW .....................................................................................29

I.     ARGUMENT...............................................................................................30

     A.     The District Court Did Not Abuse Its Discretion in Holding that Marriott Waived Its Right to Section 13.21's Provision that Disputes Arising from the SPG Program Be Handled Individually ..................30

     B.     The Class Meets Standing Requirements Under Article III ..............46

     C.     The Class is Ascertainable ..................................................54

     D.     The District Court Properly Certified a Rule 23(c)(4) Class Against Accenture and Marriott ......................................................61

     E.     Plaintiffs' Proof Satisfies *Comcast* ....................................73

CONCLUSION ........................................................................................................83

# TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Albany Savings Bank, FSB v. Halpin*,
  117 F.3d 669 (2d Cir. 1997) ...............................................................31

*Am. Exp. Co. v. Italian Colors Rest.*,
  570 U.S. 228 (2013) ...........................................................................45

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ...........................................................................80

*AT&T Mobility LLC v. Concepcion*,
  563 U.S. 333 (2011) ...........................................................................45

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) .............................................................52

*Bello v. Beam Glob. Spirits & Wine, Inc.*,
  No. CIV. 11-5149 NLH/KMW, 2015 WL 3613723 (D.N.J. June 9,
  2015) ...................................................................................................56

*Black v. Occidental Petroleum Corp.*,
  69 F.4th 1161 (10th Cir. 2023) .............................................. 63, 64, 65

*Bohnak v. Marsh & McLennan Cos., Inc.*,
  79 F.4th 276 (2d Cir. 2023) .................................................................51

*Briseno v. ConAgra Foods, Inc.*,
  674 F. App'x 654 (9th Cir. 2017).......................................................77

*Byrd v. Aaron's Inc.*,
  784 F.3d 154 (3d Cir. 2015) ........................................................ 56, 57

*Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*,
  91 F.4th 202 (4th Cir. 2024) ...................................... 30, 54, 58

*Carolina Youth Action Project v. Wilson*,
  60 F.4th 770 (4th Cir. 2023) ..............................................................46

*Carrera v. Bayer Corp.*,
  727 F.3d 300 (3d Cir. 2013) ..............................................................55

iii

*Carriuolo v. Gen. Motors Co.*,
    823 F.3d 977 (11th Cir. 2016) ...............................................................75

*Castano v. Am. Tobacco Co.*,
    84 F.3d 734 (5th Cir. 1996) ...................................................................64

*Cernelle v. Graminex, LLC*,
    Nos. 21-1579/2649, 2022 WL 2759867 (6th Cir. July 14, 2022) .........49

*Cherry v. Dometic Corp.*,
    986 F.3d 1296 (11th Cir. 2021) ..................................................... 54, 58

*City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*,
    867 F.3d 434 (3d Cir. 2017) .......................................................... 57, 58

*Clemens v. ExecuPharm Inc.*,
    48 F.4th 146 (3d Cir. 2022) ...................................................................51

*Coe v. Cross-Lines Ret. Ctr., Inc.*,
    No. 22-2047-EFM, 2023 WL 3664921 (D. Kan. May 24, 2023) ..........70

*Comcast Corp. v. Behrend*,
    569 U.S. 27 (2013) ........................................................................ 15, 73

*Convergys Corp. v. Nat'l Labor Relations Bd.*,
    866 F.3d 635 (5th Cir. 2017) .................................................................45

*Curtis v. Propel Prop. Tax Funding, LLC*,
    915 F.3d 234 (4th Cir. 2019) ......................................................... 46, 47

*Daubert v. Merrell Dow Pharms., Inc.*,
    509 U.S. 579 (1993) ....................................................................... 15, 73

*Davis v. Wakelee*,
    156 U.S. 680 (1895) ...............................................................................43

*Donovan v. Philip Morris USA, Inc.*,
    268 F.R.D. 1 (D. Mass. 2010) ...............................................................58

*Eddlemon v. Bradley Univ.*,
    616 F. Supp. 3d 819 (C.D. Ill. 2022), *vacated and remanded on other grounds*, 65 F.4th 335 (7th Cir. 2023) ................................................59

*Eisen v. Venulum Ltd.*,
    244 F. Supp. 3d 324 (W.D.N.Y. 2017) ..................................................45

iv

*EQT Prod. Co. v. Adair*,
   764 F.3d 347 (4th Cir. 2014) ................................................................58

*Evans v. Brigham Young Univ.*,
   No. 1:20-CV-100-TS, 2022 WL 596862 (D. Utah Feb. 28, 2022), *aff'd*,
   No. 22-4050, 2023 WL 3262012 (10th Cir. May 5, 2023) ...................59

*Final Analysis Commc'n Servs., Inc. v. Gen. Dynamics Corp.*,
   253 F. App'x 307 (4th Cir. 2007) .........................................................33

*Fischer v. Gen. Elec. Hotpoint*,
   438 N.Y.S.2d 690 (N.Y. Dist. Ct. 1981) ..............................................44

*Gates v. Rohm & Haas Co.*,
   655 F.3d 255 (3d Cir. 2011) .................................................................64

*Gelboim v. Bank of Am. Corp.*,
   574 U.S. 405 (2015) ..................................................................... 2, 40

*Good v. Am. Water Works Co., Inc.*,
   310 F.R.D. 274 (S.D.W. Va. 2015) ......................................................68

*Gunnells v. Healthplan Servs., Inc.*,
   348 F.3d 417 (4th Cir. 2003) ....................................................... 64, 65

*Hadley v. Kellogg Sales Co.*,
   324 F. Supp. 3d 1084 (N.D. Cal. 2018) ...............................................77

*Hall v. Marriott Int'l, Inc.*,
   344 F.R.D. 237 (S.D. Cal. 2023) ..........................................................36

*Hargrove v. Sleepy's LLC*,
   974 F.3d 467 (3d Cir. 2020) .................................................................58

*Harris v. Med. Transp. Mgmt.*,
   77 F.4th 746 (D.C. Cir. 2023) .................................... 62, 65, 66, 68

*Hill v. Xerox Bus. Servs., LLC*,
   59 F.4th 457 (9th Cir. 2023) .................................................................34

*Hirsch Elec. Co. v. Comm. Servs., Inc.*,
   145 A.D.2d 603 (N.Y. App. Div. 1988) ...............................................49

*Holbrook v. Wexford Health Serv.*,
   No. 7:22-CV-00121, 2022 WL 4283090 (W.D. Va. Aug. 30, 2022) .................44

*Hooper v. Advance Am., Cash Advance Ctrs. of Missouri, Inc.*,
    589 F.3d 917 (8th Cir. 2009) ...............................................................34

*Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*,
    892 F.3d 613 (4th Cir. 2018) ........................................................ 52, 53

*In re Allstate Ins. Co*.,
    400 F.3d 505 (7th Cir. 2005) ...............................................................64

*In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*,
    410 F. Supp. 3d 1350 (J.P.M.L. 2019) .................................................40

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ........................................................ 65, 76

*In re Delta/AirTran Baggage Fee Antitrust Litig.*,
    317 F.R.D. 675 (N.D. Ga. 2016) ................................................... 57, 58

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
    320 F.R.D. 326 (D.N.H. 2017) .............................................................77

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    407 F. Supp. 3d 422 (S.D.N.Y. 2019) ..................................................70

*In re Foreign Exch. Benchmark Rates Antitrust Litig.*,
    No. 13 CIV. 7789 (LGS), 2022 WL 3971006 (S.D.N.Y. Aug. 31, 2022) ...........69

*In re Gen. Motors LLC Ignition Switch Litig.*,
    No. 14-MC-2543 (JMF), 2019 WL 5865112 (S.D.N.Y. Nov. 8, 2019) .............40

*In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*,
    609 F. Supp. 3d 942 (N.D. Cal. 2022)...................................................80

*In re: Marriott Int'l, Inc.*,
    78 F.4th 677 (4th Cir. 2023) ............................................. 23, 30-31, 63

*In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*,
    No. 19-md-2879, 2020 WL 6290670 (D. Md. Oct. 27, 2020) ............................50

*In re Modafinil Antitrust Litig.*,
    837 F.3d 238 (3d Cir. 2016) .................................................................75

*In re Nassau Cnty. Strip Search Cases*,
    461 F.3d 219 (2d Cir. 2006) ........................................................ 64, 65

*In re Paoli R.R. Yard PCB Litig.*,
   113 F.3d 444 (3d Cir. 1997) ......................................................... 72-73

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017) ................................................................69

*In re Processed Egg Prod. Antitrust Litig.*,
   312 F.R.D. 124 (E.D. Pa. 2015) .........................................................56

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
   725 F.3d 244 (D.C. Cir. 2013)............................................................82

*In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*,
   421 F. Supp. 3d 12 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020) .........................................................................72

*In re Urethane Antitrust Litig.*,
   768 F.3d 1245 (10th Cir. 2014) ..........................................................76

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   No. 1:08-WP-65000, 2015 WL 11995255 (N.D. Ohio Feb. 18, 2015) ..............72

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
   722 F.3d 838 (6th Cir. 2013) ..............................................................72

*In re Zetia (Ezetimibe) Antitrust Litig.*,
   7 F.4th 227 (4th Cir. 2021).......................................................... 29, 75

*In re Zyprexa Prod. Liab. Litig.*,
   238 F.R.D. 539 (E.D.N.Y. 2006)........................................................40

*Int'l Bhd. of Teamsters v. United States*,
   431 U.S. 324 (1977) ...........................................................................48

*Jacobson v. Sassower*,
   66 N.Y.2d 991 (1985)..........................................................................31

*Jones v. Hyatt Ins. Agency, Inc.*,
   356 Md. 639 (Md. 1999) .....................................................................49

*Katz v. Pershing, LLC*,
   672 F.3d 64 (1st Cir. 2012) .................................................................49

*Krakauer v. Dish Network L.L.C.*,
   925 F.3d 643 (4th Cir. 2019) ................................................................16

*L-3 Commc'ns Corp. v. Serco, Inc.*,
   673 F. App'x 284 (4th Cir. 2016) ........................................................48

*Lester v. Exxon Mobil Corp.*,
   879 F.3d 582 (5th Cir. 2018) ...............................................................43

*Leyva v. Medline Indus. Inc.*,
   716 F.3d 510 (9th Cir. 2013) ...............................................................76

*Martin v. Behr Dayton Thermal Prods. LLC*,
   896 F.3d 405 (6th Cir. 2018) ........................................... 64, 66, 70, 72

*Martin v. Marriott Int'l, Inc.*,
   No. CV 18-00494, 2019 WL 4201260 (D. Haw. July 12, 2019) ...........9

*Martin v. Yasuda*,
   829 F.3d 1118 (9th Cir. 2016) .............................................................34

*McFarlane v. Altice USA, Inc.*,
   524 F. Supp. 3d 264 (S.D.N.Y. 2021) .................................................44

*Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*,
   500 F.3d 171 (2d Cir. 2007) ................................................................33

*Miller v. Fuhu Inc.*,
   No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794
   (C.D. Cal. Dec. 1, 2015) ......................................................................77

*Morgan v. Sundance, Inc.*,
   596 U.S. 411 (2022) ......................................................... 3, 28, 32, 34

*Mullen v. Treasure Chest Casino, LLC*,
   186 F.3d 620 (5th Cir. 1999) ...............................................................72

*Nadeau v. Equity Residential Props. Mgmt. Corp.*,
   251 F. Supp. 3d 637 (S.D.N.Y. 2017) .................................................33

*Neale v. Volvo Cars of N. Am., LLC*,
   794 F.3d 353 (3d Cir. 2015) ................................................................76

*New Hampshire v. Maine*,
   532 U.S. 742 (2001) .......................................................................42-43

viii

*Newirth by & through Newirth v. Aegis Senior Communities, LLC*,
    931 F.3d 935 (9th Cir. 2019) ...............................................................34

*Ninivaggi v. Univ. of Delaware*,
    No. 20-CV-1478-SB, 2023 WL 2734343 (D. Del. Mar. 31, 2023) ............. 59, 60

*O'Leary v. TrustedID, Inc.*,
    60 F.4th 240 (4th Cir. 2023) .................................................................51

*Pulaski & Middleman, LLC v. Google, Inc.*,
    802 F.3d 979 (9th Cir. 2015) .................................................................76

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ..................................................................75

*Rogers Refrigeration Co. v. Pulliam's Garage, Inc.*,
    505 A.2d 878 (Md. Ct. Spec. App. 1986) ..............................................33

*Russell v. Educ. Comm'n for Foreign Med. Graduates*,
    15 F.4th 259 (3d Cir. 2021) ........................................................... 64, 68

*Schultz v. Emory Univ.*,
    No. 1:20-CV-2002-TW.T, 2023 WL 4030184 (N.D. Ga. June 15, 2023)...........59

*Shaw v. Mfrs. Hanover Tr. Co.*,
    68 N.Y.2d 172 (1986)............................................................................31

*Sherman v. Trinity Teen Sols., Inc.*,
    84 F.4th 1182 (10th Cir. 2023)..............................................................76

*Soutter v. Equifax Info. Servs., LLC*,
    307 F.R.D. 183 (E.D. Va. 2015)............................................................20

*Steering Comm. v. Exxon Mobil Corp.*,
    461 F.3d 598 (5th Cir. 2006) .................................................................65

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ........................................................ 3, 46, 50, 51

*Tyson Foods, Inc. v. Bouaphakeo*,
    577 U.S. 442 (2016) .............................................................................48

*United States v. Olano*,
    507 U.S. 725 (1993) .............................................................................42

*Uzuegbunam v. Preczewski*,
   592 U.S. 279 (2021) ....................................................................49

*Valentino v. Carter-Wallace, Inc.*,
   97 F.3d 1227 (9th Cir. 1996) ....................................................64

*Webb v. Injured Workers Pharmacy, LLC*,
   72 F.4th 365 (1st Cir. 2023) .....................................................51

*Weiner v. Snapple Beverage Corp.*,
   No. 07 CIV. 8742 DLC, 2010 WL 3119452 (S.D.N.Y. Aug. 5, 2010) ..............56

*Zarinebaf v. Champion Petfoods USA Inc.*,
   No. 18 C 6951, 2022 WL 910638 (N.D. Ill. Mar. 29, 2022) ..............77

*Zinkand v. Brown*,
   478 F.3d 634 (4th Cir. 2007) .....................................................43

## Statutes and Other Authorities:

U.S. Const., amend. VII .......................................................................72

28 U.S.C. § 1407 ........................................................................ 6, 31

Fed. R. Civ. P. 23 ................................................................. 23, 26, 69

Fed. R. Civ. P. 23(a) ........................................................................ *passim*

Fed. R. Civ. P. 23(b)(2) ...................................................................15

Fed. R. Civ. P. 23(b)(3) .................................................................. *passim*

Fed. R. Civ. P. 23(c) ........................................................................70

Fed. R. Civ. P. 23(c)(4) ................................................................... *passim*

Fed. R. Civ. P. 23(c)(4)(A) ..............................................................65

Fed. R. Civ. P. 23(f) .................................................................. 26, 27, 28

Fed. R. Civ. P. 42(a) ................................................................... 43-44

Fed. R. Evid. 702 ............................................................................13

NY GBL § 349 ........................................................................ 19, 20

1 T. Sedgwick, *Measure of Damages* (7th ed. 1880) .............................49

1 William Rubenstein, *Newberg on Class Actions* § 2:3 (6th ed. 2022) .......... 46, 47

11 *Williston on Contracts* § 32:12 (4th ed.) ............................................. 31

23 *Williston on Contracts* § 63:3 (4th ed.) ............................................. 34

Alexandra D. Lahav, *The Continuum of Aggregation*, 53 GA. L. REV. 1393 (2019) ........................................................................................ 40

Brief of Petitioner, *TransUnion LLC v. Ramirez*, 2021 WL 409753 .................... 51

Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. REV. 71 (2015) ................................................................................. 40-41

Herbert B. Newberg & William B. Rubenstein *et al.*, 2 *Newberg & Rubenstein on Class Actions* § 4:90 (6th ed. 2022) ............................... 65

*Manual for Complex Litigation* § 21.24 (4th ed. 2004) ............................ 69

*Marriott Announces Starwood Guest Reservation Database Security Incident*, Marriott International News Center (Nov. 30, 2018), https://news.marriott.com/news/2018/11/30/marriott-announces-starwood-guest-reservation-database-security-incident ....................... 47

*Marriott Provides Update on Starwood Database Incident*, Marriott International News Center (Jan. 4, 2019), https://news.marriott.com/news/2019/01/04/marriott-provides-update-on-starwood-database-security-incident ............................................ 47

*Starwood Guest Reservation Database Security Incident* (Nov. 30, 2018), https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2018/12/2018-11-30-Marriott-International-Notice-of-Data-Breach-to-Consumers.pdf ............................................................ 53

Sungjin Cho, Gong Lee, John Rust, and Mengkai Yu, *Optimal Dynamic Hotel Pricing*, Working Paper, 2018, https://economics.sas.upenn.edu/index.php/system/files/2018-04/hp_final_update.pdf ........................................................................ 80

# INTRODUCTION

The crux of this data breach appeal is whether Marriott may invoke a contractual provision providing that any customers' lawsuits "will be handled individually without any class action.…" That provision is buried in a standard form contract, drafted unilaterally by Marriott, in a paragraph entitled "Choice of Law and Venue," that required venue in New York and the application of New York substantive law for all disputes.

There is no dispute that Marriott acted against the terms of that provision. Marriott repeatedly invoked other state laws throughout this litigation and sought the centralization of a large MDL in Maryland, all in express derogation of its own contract. Marriott removed and tagged at least one case filed in New York to transfer for pretrial purposes to Maryland. In addition, Marriott affirmatively and successfully relied on the existence of multiple proposed class actions in seeking MDL treatment, rather than arguing that the litigation must proceed individually outside of the MDL context.

The commanding question, as directed by this Court on the previous appeal in this case, is whether Marriott may rely on one, eight-word clause (requiring individual handling of the litigation) despite having breached *every* other provision of that one-paragraph contract clause, and despite having affirmatively sought and pursued what the Supreme Court refers to (in a case Marriott ignores) as

"consolidated" (not individual) handling of the litigation. *Gelboim v. Bank of Am. Corp.*, 574 U.S. 405, 413 (2015).

The district court reexamined the entire history of the litigation and found that Marriott could not now selectively enforce the class waiver provision of its contract. First, the court found that Marriott, *by its own conduct*, abandoned its ability to invoke a contractual provision that it had already repeatedly breached. Second, the court found that because the provision was directed to how a case might be "handled," Marriott impermissibly transgressed on the managerial authority of the court, particularly a court charged with pretrial coordination as an MDL transferee court. Third, the court noted that the particular class waiver at issue, one that offers no arbitration or any other forum, was an "adhesive" form contract, although the court ultimately did not rule on unconscionability. Finally, the court found that by failing to invoke the class action limitation for the first number of years of the litigation, Marriott had waived the clause by omission.

Although Appellees submit that the district court was correct on each of the four independent grounds, this Court need reach no further than the first rationale to affirm the ruling below. The factual record, thoroughly assessed by the district court, overwhelmingly supports the court's finding that Marriott affirmatively abandoned its right to bar class litigation. Actions taken in litigation that are contrary to a legal position taken subsequently provide a well-established and sufficient basis for

waiver. As the Supreme Court stated in its most recent decision on waiver (another case not cited by Marriott), the test is whether a party has "knowingly relinquished" its contractual right "by acting inconsistently with that right[.]" *Morgan v. Sundance, Inc.*, 596 U.S. 411, 419 (2022). The facts show conclusively that Marriott did so here.

The remainder of this appeal is the usual potpourri of objections to class actions trotted out by Defendants (and the Chamber of Commerce as amicus): an overreading of *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), to demand that class members individually prove Article III standing prior to class certification; a claim that the class cannot be ascertained even though it is a subset of the people to whom Marriott directed notice of the data breach in question (using Marriott's own database); and the usual "our expert is better than your expert" argument, an obvious merits inquiry that is not even supported here by a *Daubert* challenge. None of these should long detain this Court, especially given Judge Grimm's and Judge Bailey's careful and thorough analysis of these issues.

The real issue here is whether, by its conduct in breach of contract, Marriott waived the right to invoke those very same contractual provisions against its customers. For the reasons that follow, there is nothing erroneous in the district court's detailed analysis of Marriott's continual and willful breaches of its own

contract. And all of Marriott's and Accenture's remaining arguments are meritless. The certification should be affirmed.

## I.    STATEMENT OF THE FACTS

### A.    Background of the Litigation

#### 1.    The Data Breach

In 2015, Marriott agreed to buy Starwood Hotels and Resorts Worldwide, Inc. ("Starwood"), for $12.2 billion. JA1391.[1] At the time, Starwood and its IT provider, Defendant Accenture, had allowed Starwood's systems to fall far below industry security standards that Marriott itself had implemented ten years earlier. *Id.* As one of Starwood's IT executives put it, "the same old [security] themes" that Starwood had neglected for years meant that Starwood had "little ability to withstand" an attack from hackers. *Id.* Marriott's cybersecurity leaders viewed Starwood's systems as fundamentally insecure and out-of-date and often requested funds for remediation. *Id*. The weaknesses with Starwood's systems were well-known and recognized by Marriott's own senior executives, who nonetheless repeatedly rejected requests to revamp the security system. *Id*.

According to Marriott's timeline, attackers entered Starwood's systems in July 2014, and went undetected for four years until September 2018. JA1392. These

---

[1] This brief refers to Marriott and Starwood collectively as Marriott. References to page numbers are to the pages of the Joint Appendix, or for matters not in the Appendix, to the pages designated by the CM/ECF system in the District Court.

intrusions allowed the attackers to access enormous amounts of personal information about Marriott's customers, including names, addresses, phone numbers, email addresses, payment-card information, and passport information. JA1318. This access turned into theft after the attackers extracted from the stolen files (termed "exfiltration" in the tech world) the personal information contained in 133.7 million guest records, within the United States (and tens of millions more outside of the United States). JA1228. Both regular Marriott guests and those who were members of the Starwood Preferred Guest Program (discussed below) had their information taken.

Discovery has shown that Marriott did not provide adequate security. Marriott employees spoke frankly about Marriott's weak security, referring to it as the "cumulative effect" of "having a couple of shots of tequila … every night for years," and further admitted that Marriott would be "vulnerable to [a] weak defense in the court of law in case of a breach." JA1391, 1396. The United Kingdom Information Compliance Office investigated the breach, fined Marriott £80 million, and determined that it stemmed from four key security failures: (a) the lack of multifactor authentication; (b) the presence of broad access to private information to too many

employees; (c) the lack of adequate systems monitoring; and (d) the failure to encrypt certain types of personal information. JA1392–93.[2]

## 2.    Claims Asserted and Centralization

After Marriott revealed the extent of the breach to the public, multiple class actions ensued, alleging Marriott and Accenture failed to take reasonable measures to protect Marriott customers' personal information against the foreseeable risk of a cyberattack. Plaintiffs asserted a number of contract and statutory consumer-protection claims under various states' laws, as well as state-law negligence and negligence per se claims.

Pursuant to 28 U.S.C. § 1407, Plaintiffs sought centralization of myriad cases filed in multiple federal districts. JA138–41. Marriott strongly—and without hesitation—supported MDL treatment and urged that the cases be centralized in the District of Maryland, where Marriott was headquartered. JA138–48. The JPML agreed and selected then-Judge Paul Grimm as the transferee judge. JA152–54.

## B.    Bellwether Claims

Marriott and Plaintiffs jointly identified ten bellwether claims to test the sufficiency of the pleadings; each was tied to the law of a particular state, with the named plaintiffs from the particular state serving as bellwether plaintiffs. At no point

---

[2] Plaintiffs' unrebutted liability expert, Mary Frantz, identified similar issues. JA1393, 1402.

did Marriott challenge either centralization before the MDL court in Maryland or the application of the laws of the various states to the dispute with citizens of those states; to the contrary, it supported and participated in those efforts.

Plaintiffs selected negligence under Florida Law, negligence per se under Georgia law, breach of contract under Maryland law, California Unfair Competition Law, and New York General Business Law. Marriott selected negligence under Illinois law, breach of contract under New York law, Maryland Consumer Protection Act, Michigan Identity Theft Protection Act, and implied contract under Oregon law. JA408–09. Plaintiffs and Accenture followed a similar process. JA411–12.

### C.    SPG Program and Terms

During the relevant period prior to the breach, Starwood customers could enroll in the Starwood Preferred Guest ("SPG") Rewards Program, whose Terms & Conditions controlled "how members [would] manage their accounts, book reservations, achieve elite status, earn and redeem points, [address] the expiration of points as well as the ability to use points with third-party partners such as airline frequent flyer programs." JA1447. These terms were in effect at the time of the breach. Starwood (now Marriott and referred to herein as such) retained the unilateral right to "change the SPG Program and the SPG Program Terms at any time, for any reason and without notice." JA1463, at § 13.1. The SPG Terms also explicitly incorporate the "Starwood Privacy Statement," JA1447, which in turn

7

states that Marriott "will take appropriate steps to ensure that your personal data is protected and handled as described in this Privacy Statement." JA1410. (Plaintiffs' breach of contract claims allege that Marriott breached this contractual commitment to protect personal data.) JA529–530, at ¶¶ 318–21. These SPG Terms were not negotiated by any individual class member and were drafted entirely by Marriott.

Marriott's contract with Starwood members had a clause entitled Choice of Law and Venue. It provided:

> **13.21 *Choice of Law and Venue.*** Any disputes arising out of or related to the SPG Program or these SPG Program Terms will be handled individually without any class action, and will be governed by, construed and enforced in accordance with the laws of the State of New York, United States, without regard to its conflicts of law rules. The exclusive jurisdiction for any claim or action airing out of or relating to these SPG Program Terms or the SPG Program may be filed only in the state or federal courts located in the State of New York, United States.

JA1466, at §13.21.

Notably, there was no separate subheading for a class action waiver or for individual handling, and not even a separate sentence devoted to it. *Id.* Instead, it was inserted into a paragraph that was purportedly focused solely on "Choice of Law and Venue." *Id.* Unlike most class action waivers that have come before federal courts, there was no offer of arbitration for the resolution of disputes. *Id.*

### D.    Waiver of the Choice of Law and Venue Provision

Marriott's claim that Plaintiffs' waiver argument is based entirely on Marriott's pursuit of MDL treatment, Marriott Br. at 23–26, ignores that Marriott

8

repeatedly and continually engaged in conduct—before the JPML *and* the MDL

court—contrary to every provision of Section 13.21. Specifically:

### 1.    Venue

➢ Marriott asked the JPML to transfer dozens of class cases across the country to the District of Maryland. JA138–51.

➢ In urging MDL centralization in Maryland, not New York, Marriott did not urge transfer to any federal district court in New York, even as a backup argument. *Id.*

➢ Marriott tagged at least one case filed in district court in New York as proper for transfer to the MDL in Maryland. JA139, n.3, 151.

➢ Marriott did not seek dismissal or move to transfer any cases based upon improper venue. *See* ECF No. 450-1.

➢ Marriott did not move to sever claims of SPG members and transfer to a district court in New York, despite doing so based upon the same venue clause in another unrelated case. *See Martin v. Marriott Int'l, Inc.*, No. CV 18-00494, 2019 WL 4201260 (D. Haw. July 12, 2019).

➢ Marriott admitted in its Answer that venue was proper in Maryland. JA863 at ¶ 11, 962 at ¶ 11.

➢ Marriott waited 31 months before specifically referencing or invoking Section 13.21 of the contract, and during that time participated in nearly 18 months of extensive discovery, including producing millions of pages of documents, conducting dozens of depositions, arguing numerous discovery disputes, and engaging numerous expert witnesses. JA1351–54. When it finally invoked Section 13.21 for the first time in opposition to Plaintiffs' Motion for Class Certification, it invoked only one portion of it (individual handling) while again abandoning the venue and choice of law portions that would have required the application of New York law in a New York venue. *Id.*

## 2.     Choice of Law

➢ "At status conferences in April and May, 2019, the parties jointly suggested a bellwether approach using plaintiffs from several states and claims under those various states' laws." JA1661.[3]

➢ Marriott did not seek to dismiss all claims that were not brought under New York law. *See* ECF No. 450-1. Nor did Marriott assert the choice of law portion of the venue clause as a defense or basis for dismissal of non-New York claims in its Answer. *See* JA861–959, 960–1059.

➢ Marriott did not oppose class certification of non-New York claims on the basis that New York law governs all claims or argue for the application of one state's laws. *See* JA1303–75.

➢ Accenture goes so far as to inform this Court that all parties have agreed to multiple states' laws: "The district court has yet to rule on choice of law, but *all parties are in agreement that plaintiffs' individual states of residence should govern. See* JA1609, 1631, 1640." *See* Accenture Br. at 46 (emphasis added).

## 3.     Individual Handling of Litigation

➢ Marriott told the JPML that consolidated litigation was appropriate because it would "prevent duplicative discovery and inconsistent pretrial rulings[.]" JA140.

➢ Marriott affirmatively relied on the multitude of putative class actions filed in various federal courts in seeking MDL treatment. JA139–44. And it was successful in convincing the JPML to centralize, *inter alia*, because of the need to "prevent inconsistent pretrial rulings on class certification…." JA152–53. At no time did Marriott inform the JPML that, in its view, class

---

[3] The parties stipulated that no party would be waiving its rights to make arguments about choice of law by participating in the bellwether process. JA408. But the district court found that Marriott's conduct constituted a waiver, independent of this purported reservation. JA1661.

actions were in fact barred by Section 13.21, and that the various district courts would not be wrestling with class certification issues at all.

➢ Marriott took the position that it had a legitimate interest in consolidating an individual state court action with the many others that had been filed because of the data breach. JA381–388.

➢ Marriott advocated for a bellwether process that would allow it to litigate the claims of several named plaintiffs together and receive rulings on standing and its defenses that could be applied on a classwide basis to "the plaintiffs' collective allegations." *See* JA372–75.

➢ Despite advocating for a bellwether process to test representative claims and injuries to assess the strength of Marriott's defenses and plaintiffs' claims, JA373, Marriott did not raise the class action waiver at any point during the bellwether negotiation process, including dozens of meet-and-confers and court conferences.

➢ Marriott did not explicitly raise the Section 13.21 class action waiver during its motion to dismiss and did not seek to dismiss or strike the class allegations. *See* ECF No. 450-1.

E.    **District Court Rulings**

1.    **Motion to Dismiss/Article III Rulings**

a.    **Feb. 21, 2020 Order on Marriott's Motion to Dismiss**

In its February 21, 2020 order, the district court ruled on Marriott's motion to dismiss all of the bellwether claims, in which Marriott claimed that most of the plaintiffs lacked standing and that all plaintiffs failed to state claims upon which relief could be granted.

As an initial matter, the court confirmed Plaintiffs' Article III standing, ruling that they "adequately alleged that they suffered injury-in-fact[.]" JA791. The court

held that Plaintiffs offered "much more extensive allegations concerning the targeting of personal information for misuse" than in the Fourth Circuit cases cited by Marriott. JA795. Various bellwether plaintiffs alleged "actual misuse of their personal information," and all of the bellwether plaintiffs "adequately pled imminent threat of identity theft"—especially given Plaintiffs' allegations regarding "the targeting of personal information in the cyberattack and the allegations of identity theft by other plaintiffs whose personal information was stolen…." JA795–96. In addition, the bellwether plaintiffs "allege[d] that they spent time and money to mitigate the harms from the data breach," and that they suffered a "loss of value of their personal information." JA796, 810. Plaintiffs also alleged injury from the fact that "they lost the value of [their personal] information." JA797. The court further found that Plaintiffs' injuries were traceable to Defendants' conduct. JA807–09.

With respect to Plaintiffs' bellwether claims, the court held that Plaintiffs alleged viable claims under California, Florida, Georgia, Maryland, Michigan, New York, and Oregon law, but it dismissed their negligence claims under Illinois law. JA855.

### b.    Oct. 27, 2020 Order on Accenture Motion to Dismiss

In its October 27, 2020 Order addressing the motion to dismiss filed by Accenture, the district court rejected Accenture's Article III standing arguments for the same reasons stated in connection with its February 21, 2020 ruling regarding

12

Marriott. ECF No. 671. The court rejected Accenture's motions to dismiss under Maryland, Connecticut, and Georgia law, but dismissed Plaintiffs' claim for negligence *per se* under Maryland law. *Id.* at 50.

### 2.      May 3, 2022 *Daubert* Ruling

In its May 3, 2022 Order, the district court granted in part and denied in part Defendants' motion to exclude the opinions of Plaintiffs' damages expert, Jeffrey T. Prince, Ph.D. JA1186–1223. At the outset, the court noted that, in addition to the extensive briefing, it had the benefit of an expert "tutorial," in the form of an all-day hearing, with both Dr. Prince and Defendants' expert, Catherine Tucker, Ph.D. JA 1189. Moreover, the court appointed its own expert, John de Figueiredo, Ph.D., who assisted the court in "understand[ing] the many complex economic concepts underlying Plaintiffs'… damages models, and in understanding the many publications cited by Dr. Prince and Dr. Tucker in their reports." JA1189, n.4.

The court ruled that Dr. Prince's model for calculating classwide loss of market value of compromised personally identifiable information did not satisfy Federal Rule of Evidence 702. JA1186–1223.

However, the court denied Defendants' motion to exclude Dr. Prince's overpayment damages model based upon conjoint analysis, an economic model of hotel competition, and ultimately, a statistical measure of the difference between the amount paid for a product and the amount that would have been paid had full

information been known, including the refusal to contract at all. *Id.* Such a model allows a standard measure "to formulaically calculate the amount that class members overpaid for their respective hotel stays." JA1272. While thousands of calculations would have to be run to yield damages, at least one run of the model for each class member, and the numerical value calculated as damages "will change for each class member based on the personal and market data related to their hotel stay(s)." JA1273. "However," the court held, "such differences in the computation of damages does not undermine the common, classwide nature of a methodology." JA1273. Generating the damages "information will be time intensive, but it does not require resolving individualized issues of a substantive nature." JA1274. The court explained that Prince "selected his economic model… from a series of well-regarded economic publications (some of which were studies of the hotel industry, and employed methodology identical or similar to that used by Prince in this overpayment model)…." JA1201. The court detailed the three analytical steps that the model utilized, JA1203–04, and noted that Prince "tested his methodology with both current and historical information relating to the bellwether plaintiffs," based on data supplied to him, "thereby applying his model, to the extent then possible, to the facts of this case." JA1208. The court considered and rejected various criticisms offered by Defendants' expert, Dr. Tucker. *Id.* The court was satisfied that the model was sufficient for purposes of class certification. *Id.* Finally, the court noted that "Dr.

Prince's model is consistent with Plaintiffs' overpayment theory of harm, satisfying the *Comcast* requirement that '[a] plaintiff's damages case [] be consistent with its liability case.'" JA1276 (quoting *Comcast Corp. v. Behrend*, 569 U.S. 27, 35 (2013)). Importantly, in this appeal, Defendants do not challenge any of the district court's *Daubert* findings but instead rely solely on *Comcast* in challenging Dr. Prince's methodology.[4]

### 3.  May 3, 2022 Class Certification Ruling

Also on May 3, 2022, the district court granted in part and denied in part Plaintiffs' motion for class certification. JA1226–98. In short, with respect to Plaintiffs' contract and consumer-protection claims against Marriott, the court certified three statewide damages classes under Rule 23(b)(3). JA1295–96. With respect to Plaintiffs' negligence claims against Marriott and Accenture, the court certified four statewide "issue" classes under Rule 23(c)(4) on the issues of duty and breach, with individualized proceedings on remaining issues to follow.[5] JA1296–97.

Initially, the court addressed Article III standing. It ruled that "Plaintiffs need not demonstrate that *every* class member has standing at the class certification stage." JA1233 (emphasis in original). Yet, certification would not be appropriate if

---

[4] *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993); *Comcast*, 569 U.S. 27.

[5] The court denied Plaintiffs' motion to certify a class for declaratory and injunctive relief under Rule 23(b)(2) without prejudice. JA1294, n.66.

the class included a "large number of uninjured persons…." JA1233–34 (quoting

*Krakauer v. Dish Network L.L.C.*, 925 F.3d 643, 657 (4th Cir. 2019) and citing case

law). Because the class alleging overpayment included members who did not bear

the economic cost of a hotel stay, including many who traveled for work, the court

limited the class to include only "persons who bore the economic burden for hotel

room(s)." JA1236. The court further limited the overpayment class to those "who

made reservations at Starwood properties during the four-and-a-half year period

(2014-2018) in which hackers had access to Plaintiffs' [personal identifying

information]." *Id.*

The court then proceeded to analyze compliance with the Fourth Circuit's

"ascertainability" requirement. JA1236–43. Initially, the court found that the class

definition was based on objective criteria, and that Defendants did not contest this

point. JA1237. Turning to the "administrative feasibility of identifying class

members," the court found that this requirement was satisfied as well. JA1237–38.

Initially, the court rejected Defendants' argument that their database was too

inaccurate to identify class members, noting that Marriott used its internal "NDS

database to notify the proposed class members of the data breach." JA1239–40. The

court also rejected Defendants' argument that there was no feasible way to notify

only those class members within the narrower definition adopted by the court, *i.e.*,

those who bore the economic burden of the hotel rooms. First, the court explained

16

"Plaintiffs can use affidavits to help ascertain the class," and those affidavits can be "cross checked against the NDS database, which can confirm whether a reservation was made, the dates of that reservation, the payment card used, etc." JA1240–41. Second, class members may supplement the official records maintained by Marriott by submitting their "own records such as receipts and bank and credit card statements…." JA1241.

Turning to the explicit Rule 23(a) requirements, the court found that all four (numerosity, commonality, typicality, and adequacy of representation) were satisfied. JA1243–53. In the course of its typicality discussion, the court reiterated that it had amended the class definition to include only SPG members. JA1246–51. As a result, Marriott's affirmative defense of class action waiver was applicable to all class members, thereby eliminating any typicality concerns. JA1249–50.

The court did not definitively rule on the merits of the waiver argument, but it noted that "Plaintiffs raise a strong argument that Defendants have waived their right to enforce the class action waiver." JA1250, n.26. The court quoted Plaintiffs' brief, which noted that "'aside from a one-line, boilerplate affirmative defense, Defendants litigated this case for more than 31 months before asserting that Plaintiffs are subject to a class waiver. Defendants did not raise it as part of the bellwether negotiation process, address it in dozens of meet-and-confer and scheduling conferences, or raise it as part of any motion practice [prior to Defendants'

17

opposition].'" *Id*. Nonetheless, the court noted that it "need not rule on this issue at this time," but would address it as an "affirmative defense[] … at the merits stage of the litigation." *Id.*

Turning to Rule 23(b)(3) damages classes and subclasses, the court denied class certification without prejudice with respect to those classes to the extent that they relied on the theory of lost market value of the compromised data in the hands of Plaintiffs. JA1253–59. This followed from the court's prior ruling that Dr. Prince's model on that theory was inadmissible. JA1186–1223.

The court then addressed Rule 23(b)(3) in the context of Plaintiffs' overpayment theory. JA1261–79. The court found that the breach of contract claims did not pose individualized issues because the contracts at issue were form contracts that did not vary from one class member to another. JA1261–63. Affirmative defenses, including statute of limitations, could be easily resolved. JA1264–67. The court also found no problematic individualized issues with respect to the various consumer protection claims (with the exception of the Michigan Identity Theft Protection Act, which the court found raised significant individualized issues). JA1267–72. The court focused most of its attention on whether damages issues caused the proposed class to fail predominance. JA1272–79.

The court noted that "[t]he outcome of [the] predominance analysis largely hinge[d] on the Court's determination as to whether Dr. Prince's model is a common

18

statistical formula that applie[d] classwide." JA1273. The court explained that "each class member will use the same model to calculate his or her individual overpayment damages[,]" and that "[t]he model relies upon the same set of variables for every hotel stay." *Id.* And it explained that "differences in the computation of damages does not undermine the common, classwide nature of a methodology." *Id.* (citing authority). The court rejected Marriott's argument that "acquiring the information necessary to calculate damages requires too much individualized inquiry." JA1274. The court underscored that while Dr. Prince had not yet provided damages calculations for all class members, but only for the bellwether plaintiffs, "he is not required to provide precise calculations at this time to satisfy predominance." JA1276. Indeed, "it would have been impossible for him to do so" given that Marriott had not provided the necessary discovery. *Id.* The court noted that Dr. Prince's model "incorporate[d] [expert Sarah] Butler's conjoint analysis,"[6] and "isolated the overpayment damages from the other types of damages that Plaintiffs seek." *Id.*

The court also found that common issues predominated with respect to statutory damages under New York General Business Law Section 349, and thus

---

[6] As detailed below, Ms. Butler's conjoint analysis conducted a survey that established that customers had less willingness to pay for staying in a hotel that does not adequately protect data. JA1199–1200.

certified a Rule 23(b)(3) damages class encompassing persons residing in New York. JA1277–78. The court noted that Section 349 sets statutory damages at $50 per offense. JA1277. Thus, "[a]ny possible individualization as to calculating damages would be mechanical in nature, i.e., counting the number of hotel stays for which a class member is eligible for damages." *Id.* The court explained that such a "simple and straightforward" calculation of individualized statutory damages did not defeat predominance. JA1278 (quoting *Souter v. Equifax Info. Servs., LLC*, 307 F.R.D. 183, 217 (E.D. Va. 2015)).[7] The court went on to reject Marriott's argument that proving "actual injury" or the "fact of damages" required individualized inquiries that defeated predominance. *Id.* The court rejected these arguments as "no more successful in the statutory damages context" than with respect to overpayment. *Id.*

Finally, the court noted that it had the authority down the road "to modify its class certification order" or to "decertify the class altogether to address [the] individualized damages issues." JA1277.[8]

Turning to Rule 23(b)(3) superiority, the court recognized that, "[w]hile this class action presents management difficulties, those difficulties are ultimately

---

[7] Neither Marriott nor Accenture even mentions the certification of the New York statutory damages class in their opening briefs.

[8] The court also ruled that the calculation of statutory damages "would be mechanical in nature," and that recovery of nominal damages did "not require individualized calculation." JA1277–78. As a result, these theories of damages did not raise predominance concerns.

outweighed by those associated with the alternative: thousands of individual trials." JA1284.

The court then addressed whether to certify issue classes under Rule 23(c)(4) with respect to the negligence claims against Marriott and Accenture. JA1284–92. Plaintiffs' proposed issues related to duty (common law or statutory), breach, and causation. The court noted that, while the law was not explicit, courts and commentators had construed Fourth Circuit case law as endorsing a broad view of issue classes, "in which common questions need predominate over individual ones only for the specific issues that are certified, not for the entire cause of action." JA1286 (citations omitted).

Applying that standard, the court found that common issues did not predominate on causation. JA1288. However, the court found that common issues did predominate on duty and breach. JA1288–89. The court rejected Accenture's argument that individualized issues were created with respect to "class members' respective relationships with the company," noting that Accenture maintained that it made no representation to class members, had no interactions with them, and did not store, request, or accept class members' personal information. JA1289–90. With respect to superiority, the court recognized that "important issues related to causation, affirmative defenses, and damages" would not be resolved in the issue class trial, but that "[g]iven that the Court has certified damages classes against

21

Marriott, the Court will already be analyzing the intertwined factual circumstances relevant to the duty of breach issues." JA1291. Not resolving the duty and breach issues would mean that "[t]he parties would have to repeatedly put on the same witnesses and produce the same documents, incurring considerable expense." *Id.* Moreover, "in the event that the results of the issues trials are favorable to Marriott and Accenture, the litigation against them as to negligence and negligence per se would end." JA1291–92.

Finding the requirements of Rule 23 to be satisfied, the district court certified seven classes. JA1295–97. The court certified three Rule 23(b)(3) damages classes comprised of all natural persons residing in Maryland, New York, and California, respectively, "whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property in the United States, was compromised in a data breach announced by Marriott on or about November 30, 2018; and who: (1) had a Starwood Preferred Guest ('SPG') membership, (2) bore the economic burden for the hotel stay, and (3) made the reservation from July 28, 2014 to November 30, 2018." *Id*. The court also certified four Rule 23(c)(4) issue classes as to the issues of duty and breach comprised of all natural persons residing in Florida, Maryland, Connecticut, and Georgia, respectively, "who had a Starwood Preferred Guest ('SPG') membership and whose Personal Information, given to Starwood in connection with the making of a reservation at a Starwood property,

22

was compromised in a data breach announced by Marriott on or about November 30, 2018."[9] *Id.*

### 4.     This Court's August 18, 2023 Opinion

In its August 18, 2023 opinion, this Court vacated the district court's class certification order and remanded for further proceedings. The Court ruled that the district court erred in failing to resolve the class waiver issue at the certification stage. It noted that there was no case requiring this approach, but that the "consensus practice" was to do so. *In re: Marriott Int'l, Inc.*, 78 F.4th 677, 686 (4th Cir. 2023). Although the Court noted that "it [wa]s not obvious" that Marriott needed to do anything other than assert the class action waiver in its answer, it declined to decide the issue itself, noting that the district court had "*by far* the better vantage point." *Id.* at 687 (emphasis added). The Court also declined to take up in the first instance any issues regarding "the validity and scope of the Terms & Conditions class waiver." *Id.* at 688. Finally, the court explained that, because it was vacating the (b)(3) certification involving Marriott, the foundation for the district court's (c)(4) superiority finding (the intertwined nature of the (b)(3) and (c)(4) classes) no longer applied. *Id.* at 688-90. Thus, it vacated the (c)(4) certification as well. *Id.* at 690. The

---

[9] The individual Rule 23(b)(3) damages class and Rule 23(c)(4) issue class definitions differed only in regards to the state of residency of class members and the corresponding state law claims for which they were certified. JA1295–97.

23

Court declined to decide whether the Fourth Circuit would adopt the broad view of Rule 23(c)(4). *Id.*

> **5.    The November 29, 2023 District Court Decision on Remand**[10]

On remand, the district court held that Marriott had waived its right to assert the Choice of Law and Venue provision. JA1651–71. Looking at the totality of circumstances, the court noted that "Marriott requested that all of the cases be consolidated into an MDL action," which is "the antithesis of handling each claim on an individual basis[.]" JA1660. In so doing, Marriott sought to "eliminate duplicative discovery," "reduce litigation costs," and "conserve the time and effort of the parties, attorneys, witnesses, and courts[.]" JA1661. Moreover, Marriott requested that the cases be transferred to the District of Maryland, which was "wholly inconsistent with the Choice of Law and Venue provision's requirement that any case be filed in New York[.]" *Id.* Marriott also maintained that "venue was proper in the District of Maryland[.]" *Id.* Also, at status conferences in April and May 2019, Marriott joined Plaintiffs in adopting a bellwether approach under the laws of multiple states, which was "wholly inconsistent with handling cases on an individual basis, in New York, applying only New York law." *Id.* The court noted this Court's suggestion in dictum that, by raising the Choice of Law and Venue

---

[10] Upon Judge Grimm's retirement, the JPML reassigned the case to Judge Stephanie A. Gallagher and then to Judge John Preston Bailey.

24

provision in its answer and in opposition to class certification, Marriott may have avoided waiver by omission. But, looking at Marriott's conduct in the litigation under a test focusing on the "'totality of the parties' actions,'" the district court concluded that despite the minimal steps of invoking the class action bar in a single pleading years into the litigation, Marriott affirmatively waived its right to invoke its contractual defense because of myriad actions undertaken in violation of that defense. JA1660-62 (citation omitted). It emphasized that "[t]he provision [13.21] prohibits any collective handling of the claims, including by class action." JA1662. "It is not merely a class action waiver." *Id.* In the court's view, "[i]t appears that Marriott having not fared as well as it had hoped in the bellwether process is now attempting to invoke one half of one third of the Choice of Law and Venue provision[,]" although "[i]t has clearly waived 5/6 of the provision." *Id.* The court reasoned that "Marriott should not be permitted to cherry-pick the rules from a provision, having waived every other term therein." *Id.*

The court also emphasized that "the Choice of Law and Venue provision does not state that SPG members will not bring or participate in class actions"; rather, it "seeks to limit this Court's own authority by stating that '[a]ny disputes … will be handled individually.'" JA1665. In the court's view, "[t]he parties cannot by agreement dictate that a district court must ignore the provisions of [Rule 23]." *Id.* Thus, "the adhesive provision, buried on the last page of the Terms cannot direct this

Court to ignore the provisions of Rule 23 of the Federal Rules of Civil Procedure." JA1670.

Finally, having rejected Marriott's reliance on the Choice of Law and Venue provision, the court "re-certif[ied] the [(b)(3)] classes with respect to Marriott in this case." *Id.* Having done so, it "reinstated" the Rule 23(c)(4) class, which Judge Grimm certified after finding that superiority was satisfied in light of the intertwined nature of the (b)(3) and (c)(4) classes.

### 6. After Filing its Opening Brief, Marriott Revealed That It Has Significantly and Repeatedly Misstated Its Level of Security

The district court found (as discussed above) that Plaintiffs adequately alleged standing, despite Marriott's assertion that the impact of the breach was trivial because the vast majority of the stolen payment card data and passport data was protected by encryption. In fact, that encryption claim, as well as the precise type of encryption purportedly utilized (AES-128), was repeated numerous times in briefing to the district court, to this Court, throughout discovery, and even to regulators. *See* ECF No. 1181-1, at 5–13.[11]

---

[11] These representations were made by Marriott in: (1) its securities filing announcing the breach; (2) its website; (3) its motion to dismiss Plaintiffs' complaint; (4) its answer to Plaintiffs' complaint; (5) a discovery dispute related to an interrogatory response related to encryption; (6) its opposition to Plaintiffs' motion for class certification; (7) its motion for summary judgment against a related case brought by the City of Chicago; (8) its 2022 Rule 23(f) petition to this Court; (9) interrogatories directly related to encryption; (10) numerous fact and corporate

Just days after the filing of its opening Brief in this appeal, however, Marriott revealed to Plaintiffs' counsel for the first time that it had not been truthful in its countless representations that the hacked credit card data and certain passport numbers were encrypted; rather, this data was *not* encrypted. Marriott admitted that the so-called "protection" for this data was merely an outdated insecure system known technically as "SHA-1 hashing function"—a long out-of-date methodology that can easily be decoded by a novice with a laptop in a matter of hours. *See* ECF No. 1181. Thereafter, Plaintiffs and the City of Chicago filed a joint motion requesting an expedited status conference before the district court, additional discovery, and an extension of time. *Id.*

On April 10, 2024, Judge Bailey held a status conference on these disclosures. The court reopened discovery for sixty days "into Marriott's security methods at Marriott's expense, including re-deposing Marriott's and Accenture's fact and expert witnesses who testified incorrectly about Marriott's 'encryption,' including Verizon," ordered Marriott to provide corporate representative testimony, and further ordered Marriott to correct misstatements on its website about the breach. ECF No. 1192 at 1–2.

---

representative depositions; and (11) representations to regulators including State Attorney Generals and the ICO. *Id.* Accenture likewise made false representations about encryption in its 2022 Rule 23(f) petition to this Court. *Id.* at 9.

While Marriott backs off any claim about encryption on this appeal, co-Defendant Accenture continues to understate the significance of the data breach by misleadingly asserting that of the compromised files "the vast majority… were protected by cryptography." Accenture Br. at 5–6.

The timing of Marriott's disclosure reflects the reality that the true facts—had they been revealed earlier—would have supported additional claims, as well as provided strong additional arguments for Plaintiffs in support of class certification.[12]

## SUMMARY OF ARGUMENT

The district court did not err in finding that Marriott waived its right to enforce Section 13.21's provision that disputes be handled individually. As the Supreme Court has made clear, a party "knowingly relinquish[es]" its contractual right "by acting inconsistently with that right[.]" *Morgan*, 596 U.S. at 419. Marriott repeatedly breached the terms of Section 13.21, a section it unilaterally drafted, by affirmatively acting contrary to its provisions. The district court properly held that Marriott thus waived its right to enforce Section 13.21.

Likewise, the district court's class certification rulings are well reasoned and not an abuse of discretion. **First**, the district court properly held that class members have Article III standing. All class members have been injured by Marriott's and

---

[12] In light of these serious recent developments, the Court may wish to consider vacating its order granting Rule 23(f) review so that the issues and discovery currently before Judge Bailey can be considered on a more complete record.

Accenture's failure to provide adequate data security. **Second**, the district court did not abuse its discretion in finding that class members are ascertainable. As the district court properly concluded, it is administratively feasible to identify all potential class members starting from Marriott's own database. **Third**, the district court did not abuse its discretion in certifying issue classes under Rule 23(c)(4). Issue certification will materially advance the litigation, especially given the fact that if Defendants win on those issues, the negligence claims will be fully resolved in Defendants' favor. And the Rule 23(c)(4) class is intertwined with the Rule 23(b)(3) class, underscoring the efficiency gains of proceeding with both classes simultaneously. **Finally**, the district court properly held that Plaintiffs satisfied the Supreme Court's *Comcast* decision. *Comcast* does not mandate that damages be proven on a classwide basis. *See, e.g.*, *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th 227, 237 (4th Cir. 2021). In any event, Plaintiffs offered a viable expert model— carefully scrutinized by the district court—which Defendants do not contend violates *Daubert.*

## STANDARD OF REVIEW

Appellees accept the standard of review as framed by the Appellants, with the caveat that Appellants fail to acknowledge that under this Circuit's precedent, heightened ascertainability is reviewed under an abuse of discretion standard.

*Career Counseling, Inc. v. Amerifactors Fin. Grp., LLC*, 91 F.4th 202, 212 (4th Cir. 2024).

## I.    ARGUMENT

### A.    The District Court Did Not Abuse Its Discretion in Holding That Marriott Waived Its Right to Section 13.21's Provision That Disputes Arising from the SPG Program Be Handled Individually

In a careful opinion that reviewed the crucial waiver evidence, the district court concluded that "Marriott waived any benefit from its Choice of Law and Venue provision." JA1670. That fact-bound ruling was correct.[13] Indeed, Marriott's widespread, consistent, and proactive conduct in violating the terms of Section 13.21 compelled the district court's conclusion.

As an initial matter, Marriott does not dispute that the district court's waiver determination, as framed by this Court, "is a matter squarely within the purview of the district court, which has by far the better vantage point." *In re: Marriott Int'l*, 78

---

[13] Marriott castigates the district court for supposedly ignoring this Court's statement "it is not obvious that more would be required" for Marriott to preserve waiver. Marriott Br. at 22. But contrary to Marriott's contention, this Court was *not* telling the district court how to rule. Quite the contrary. In the very next sentence following the one that Marriott quotes, this Court made clear that the issue was "a matter squarely within the purview of the district court, which has by far the better vantage point." *In re: Marriott*, 78 F.4th at 687. Marriott unfairly disparages the district court by quoting this Court entirely out of context. Moreover, this section will address how the quoted portion of this Court's opinion addressed only the question of waiver by omission, not the affirmative steps taken by Marriott in disregard of its contractual language. Nor does the quoted section address the question of judicial estoppel that is discussed *infra*.

F.4th at 687. Furthermore, while Marriott argues that Section 13.21 somehow does not apply to actions taken in a multidistrict litigation, Marriott Br. at 23-26, Section 13.21 contains no such exception. It states, with no ambiguity, that "*[a]ny disputes* arising out of or related to the SPG Program or these SPG Program Terms *will be handled individually* without any class action…." JA1466 (emphasis added). Marriott could have easily drafted Section 13.21 to provide: "With the exception of pretrial treatment under 28 U.S.C. § 1407," all disputes "will be handled individually without any class action…." Or it could have limited the language so that it barred only "the handling of the cases as class actions."

Marriott has no one to blame but itself for its poorly drafted language. Indeed, Plaintiffs have not located another company's terms of service that use similar language requiring that disputes be "handled individually…." It is undisputed that Marriott drafted Section 13.21 without any negotiation with individual SPG Program members. And given the importance of the terms of service, Marriott presumably assigned its best attorneys to the task. As a result, under New York law (which Marriott dictated applied under Section 13.21)—and indeed, under all states' laws— any ambiguity must be held against Marriott. *See, e.g.*, *Albany Savings Bank, FSB v. Halpin*, 117 F.3d 669, 674 (2d Cir. 1997); *Shaw v. Mfrs. Hanover Tr. Co.*, 68 N.Y.2d 172, 176 (1986); *Jacobson v. Sassower*, 66 N.Y.2d 991, 993 (1985); 11 *Williston on Contracts* § 32:12 (4th ed.) ("Since the language is presumptively

31

within the control of the party drafting the agreement, it is a generally accepted principle that any ambiguity in that language will be interpreted against the drafter…. Indeed, any contract of adhesion … is particularly susceptible to the rule that ambiguities will be construed against the drafter."). Here, of course, and as the district court found, there is no ambiguity; the language that Marriott drafted does not exempt multidistrict litigation from its terms. And Marriott cites nothing in the terms of service that even purports to do so.

Marriott seizes on the fact that it invoked the language of Section 13.21 in its answer (although it did not cite that specific term), as if that solitary act allowed it to then disregard Section 13.21 at will. But Marriott's conduct in violation of Section 13.21 is not just one of omission, i.e., a mere failure to adequately raise the defense of the contractual bar on class actions. If so, then the determination is simply whether it was ever raised, including in a passing point in the answer to the complaint, and whether waiting 31 months into litigation is too long. But here there is also waiver by *commission*, i.e., by taking affirmative steps contrary to the contract Marriott now seeks to enforce. The question is not simply waiver by exclusion, but waiver by Marriott's own breach of the contract it wrote. As discussed below, under settled law, that question is based on the totality of the circumstances. *E.g.*, *Morgan*, 596 U.S. at 419. The district court correctly followed the analysis dictated by *Morgan* and numerous other cases.

32

Thus, the district court found that Marriott's citation to the class action waiver in its answer was insufficient to preserve its defense that claims must be "handled individually." JA1661–62. In so finding, the district court expressed disagreement with this Court's previous reference to the importance of Marriott's answer as not germane to the question of whether Marriott had waived enforcement of the provision by its own affirmative actions, not just its omissions. *Id.*

Settled contract law draws this precise distinction. Under New York law, to take the contractual choice of law premise, "when a party to a contract materially breaches that contract, it cannot then enforce that contract against a non-breaching party." *Nadeau v. Equity Residential Props. Mgmt. Corp.*, 251 F. Supp. 3d 637, 641 (S.D.N.Y. 2017) (denying the defendant's motion to compel arbitration as the defendant had breached its arbitration agreement by refusing to arbitrate); *see also Merrill Lynch & Co. Inc. v. Allegheny Energy, Inc.*, 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach."). This is standard breach of contract analysis. *See, e.g.*, *Final Analysis Commc'n Servs., Inc. v. Gen. Dynamics Corp.*, 253 F. App'x 307, 313 (4th Cir. 2007) ("It is well established that a material breach by one party to a contract excuses the other party from performance.") (citing *Rogers Refrigeration Co. v. Pulliam's Garage, Inc.*, 505 A.2d

33

878, 883 (Md. Ct. Spec. App. 1986)); 23 *Williston on Contracts* § 63:3 (4th ed.) ("A party who first commits a material breach cannot enforce the contract.").

As noted, the Supreme Court and other courts around the country have made clear that the test is a "totality of the circumstances" test, not simply whether a provision was asserted in a pleading. A party cannot make a perfunctory statement in a pleading and then act 100 percent to the contrary. As the Supreme Court stated in *Morgan*, the test is whether Marriott "knowingly relinquished" its contractual right "by acting inconsistently with that right[.]" *Morgan*, 596 U.S. at 419; *accord, e.g.*, *Newirth by & through Newirth v. Aegis Senior Communities, LLC*, 931 F.3d 935, 941 (9th Cir. 2019) ("[W]e consider the totality of the parties' actions") (citation omitted); *Hooper v. Advance Am., Cash Advance Ctrs. of Missouri, Inc.*, 589 F.3d 917, 923 (8th Cir. 2009) ("A reservation of rights is not an assertion of rights.").

Not surprisingly, therefore, courts have explicitly rejected the position taken by Marriott here; i.e., that a mere assertion of some vague right in a pleading is enough to preserve that right in the face of affirmative conduct to the contrary. As the Ninth Circuit explained: "*A statement by a party that it has a right to [enforce a waiver] in pleadings or motions is not enough to defeat a claim of waiver.*" *Martin v. Yasuda*, 829 F.3d 1118, 1125 (9th Cir. 2016) (emphasis added); *Hill v. Xerox Bus. Servs., LLC*, 59 F.4th 457, 471 (9th Cir. 2023). Notably, Marriott's brief to this Court does not even cite *Morgan*, a Supreme Court case directly on point, nor any of the

case law applying the *Morgan* test.[14] Instead, it impermissibly urges a test that is flatly contrary to Supreme Court precedent.

An examination of Section 13.21 reveals three separate aspects: a venue clause (New York), a choice of law clause (New York law), and a clause requiring the individual handling of cases. Here, Marriott repeatedly and affirmatively violated not just one, but all three parts of Section 13.21.[15]

**Venue.** Marriott's conduct affirmatively violated Section 13.21's venue requirement that "[t]he exclusive jurisdiction for any claim or action … may be filed only in the state or federal courts located in the State of New York, United States." JA1466. Marriott proactively asked the Judicial Panel on Multidistrict Litigation to centralize all of the cases in the district court of *Maryland.* Indeed, Marriott

---

[14] Amicus cites *Morgan*, but does not engage the district court findings on waiver by conduct rather than by omission. Amicus Br. at 12. Indeed, amicus ignores all of the affirmative acts, discussed above and relied upon by the district court, that Marriott affirmatively took in violation of Section 13.21.

[15] Marriott contends that even if it violated the venue and choice of law provisions, it can still enforce the individual handling provision of the same paragraph. Marriott Br. at 27. Putting aside the fact that Marriott also repeatedly violated the individual handling clause, *see infra*, the severability language that Marriott cites cannot be read to preserve clauses within the same provision. Viewed against the drafter, the severability language at most leaves open the right to assert *other, separate provisions*, not clauses within the same provision. In all events, as discussed above, because Marriott affirmatively breached Section 13.21, it is precluded under settled contract law from enforcing Section 13.21 against Plaintiffs.

35

affirmatively tagged at least one case that had been filed in New York as a case suitable to be transferred to Maryland. JA139, n.3, 151.

Moreover, instead of seeking dismissal for improper venue or transfer to a New York court, Marriott removed individual actions to federal court and sought to include them in the Maryland-centered MDL. JA159. Not once did Marriott seek dismissal of any case filed outside New York on the basis of improper venue. To the contrary, Marriott admitted in its answer that venue was proper *in Maryland.* JA863, at ¶ 11, 962, at ¶ 11.[16] Indeed, Marriott waited 31 months before invoking Section 13.21 in the context of class certification, and then focused solely on the individual handling component while completely ignoring venue and choice of law. Again, Marriott cannot dismiss its own actions merely because they related in some fashion to the MDL process; as drafter, Marriott did not include an exception to Section 13.21's "individual handling" requirement for MDL proceedings.

**Choice of Law.** Under Section 13.21, all disputes arising out of the SPG Program "[w]ill be governed by, construed and enforced in accordance with the laws

---

[16] Every indication is that Marriott knew it was discarding its potential contract defenses for reasons of strategic litigation gain. In contrast, in *Hall v. Marriott Int'l, Inc.*, 344 F.R.D. 237 (S.D. Cal. 2023), Marriott denied both that the Court had jurisdiction pursuant to the Class Action Fairness Act and that venue was appropriate in the State of California based upon the exact same choice of law and venue provision. *Compare Hall v. Marriott Int'l, Inc.*, No. 19-cv-01715, Marriott's Answer to Third Am. Compl., ECF No. 92, at ¶¶ 1–4 (S.D. Cal. June 24, 2021) with JA862-63, at ¶¶ 6–10 and JA961-62, at ¶¶ 6–10.

of the State of New York, United States, without regard to its conflicts of law rules." JA1466. Marriott did not assert the choice of law provision as a defense in its answer, JA863, 962, and did not argue in opposing class certification that New York law governed all claims (nor does it so argue on appeal). JA1303–75.

**Individual Handling.** Marriott repeatedly misreads Section 13.21 as applying only to class actions—hence its argument that participation in the MDL was not a waiver. But the language of Section 13.21 is *not* limited to class actions; as the district court correctly recognized, "*While it has been described as a class action waiver, the provision is broader than that, mandating the handling of all claims on an individual basis[.]*" JA1659 (emphasis added). The district court's careful focus on the actual language—which again must be construed against Marriott, the drafter—is critical. By no means can it be said that Marriott demanded that the actions be handled *individually* when it affirmatively requested that they be centralized for MDL treatment—a procedure which, as discussed below, the Supreme Court and countless other authorities have referred to as a form of consolidation or aggregation.

Again, as the drafter of this unique contract, Marriott could have limited Section 13.21 to class actions, or it could have exempted MDLs, but it did neither. Instead, it forcefully told the JPML that consolidated litigation, as opposed to handling the cases individually, would "prevent duplicative discovery and

37

inconsistent pretrial rulings[.]" JA140. So enthusiastic was Marriott to litigate in the aggregate that it opposed remand of actions back to state court, relying on the Class Action Fairness Act. JA381–407. In addition, it affirmatively promoted an MDL and bellwether process that would allow claims of several named plaintiffs to be handled together. JA372–75, 408–10. Indeed, without mentioning Section 13.21, it affirmatively relied on the multitude of putative class action lawsuits in convincing the JPML that centralization would avoid conflicting class certification rulings. JA138–58. At bottom, the entire thrust of Marriott's strong support of MDL was that it would be *inefficient* to handle cases individually.

Now, before this Court, Marriott tries to cast the decision below as turning on a *per se* ruling that participation in an MDL vitiates a class action waiver. Marriott Br. at 20 (court below was first "in the country to hold that a party gives up its class-waiver defense by participating in an MDL"). That is simply not a correct portrayal of the ruling below. The district court made six specific factual findings as to conduct that constituted waiver of any assertion of rights under Section 13.21, the first five of which were specific acts regarding how the MDL was constituted, where it was located, and what would be controlling law. JA1660–61. At no point did the district court rule that, as a matter of law, the mere fact of participation in an MDL constituted waiver, nor can its ruling be properly read to suggest that. Moreover, despite Marriott's claim that the district court's approach would mean that a party

38

could never seek MDL and then enforce a class action waiver, Marriott Br. at 24, Marriott had at least two clear options: it could have limited Section 13.21 to class action waivers, or it could have expressly exempted pursuit of MDLs from Section 13.21 altogether. Going forward, a company drafting a class action waiver can easily avoid having conduct taken within an MDL—or affirmatively seeking an MDL—be used against it.

Marriott is seeking to enforce a contractual claim against the class. The question is not one of law concerning whether participation in an MDL somehow voids a proper class action waiver. Rather it is whether, under the express terms of Section 13.21, Marriott repeatedly breached the contractual provisions that it now seeks to invoke. The district court found that Marriott's frequent and recurring conduct was in violation of the contractual language that required that all disputes "will be handled individually without any class action," and that the "handled individually" provision of Marriott's own drafting was inconsistent with Marriott's conduct in the MDL. Marriott simply ignores these crucial findings.

More generally, Marriott errs in arguing that MDL treatment is fully consistent with Section 13.21's requirement that cases be handled "individually." Marriott Br. at 26. That language, construed against Marriott, cannot conceivably be reconciled with its pursuit of MDL treatment. The whole purpose of MDL is to economize from *aggregate*, as opposed to purely individual, treatment.

39

Thus, the Supreme Court speaks of MDLs as "consolidated" proceedings, not as cases being "handled individually," as set forth contractually in Section 13.21. *See Gelboim*, 574 U.S. at 413 (MDL actions not merged, yet "during the pendency of pretrial proceedings, final decisions might be rendered in one or more of the actions consolidated pursuant to § 1407"). Once again, Marriott fails to cite *Gelboim*, a controlling Supreme Court authority.[17]

Similarly, the JPML, numerous Circuit and district courts, and myriad commentators have identified MDL as an *aggregation* tool, designed specifically to *avoid* the inefficiencies of individual treatment of cases. *See, e.g.*, *In re Am. Med. Collection Agency, Inc., Customer Data Sec. Breach Litig.*, 410 F. Supp. 3d 1350, 1353–54 (J.P.M.L. 2019) (describing the efficiencies provided by aggregation in an MDL); *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2019 WL 5865112, at *1 (S.D.N.Y. Nov. 8, 2019) (describing an MDL as an alternative form of "aggregate litigation" to class actions); *In re Zyprexa Prod. Liab. Litig.*, 238 F.R.D. 539, 540 (E.D.N.Y. 2006) (characterizing an MDL as a "quasi-class action"); Alexandra D. Lahav, *The Continuum of Aggregation*, 53 GA. L. REV. 1393, 1394–95 (2019) (describing MDLs, along with class actions, as a "form of aggregation"); Elizabeth Chamblee Burch, *Judging Multidistrict Litigation*, 90 N.Y.U. L. REV. 71,

---

[17] While the Supreme Court has recognized the difference between MDLs and class actions in terms of the lack of complete merger of claims in MDLs, that is a difference as to form of aggregation, not individual treatment.

79 (2015) (describing MDLs as the "primary means for resolving aggregate litigation"). In the face of this overwhelming authority, Marriott's claim that MDL treatment is purely "individual" treatment cannot be taken seriously.

Indeed, here the JPML specifically found that centralization of the Marriott data breach cases (which Marriott sought and supported) would avoid the inefficiencies of individual handling by "eliminat[ing] duplicative discovery, prevent[ing] inconsistent pretrial rulings on class certification and other issues, and conserv[ing] the resources of the parties, their counsel, and the judiciary." JA152–53. Importantly, Marriott did not alert the JPML to Section 13.21 in its pursuit of MDL treatment, but instead affirmatively relied on the myriad class action lawsuits pending in various districts as a *reason* for MDL treatment; and the JPML explicitly cited the avoidance of conflicting class certification rulings as a reason for agreeing with Marriott that MDL treatment was warranted.[18] JA138–54.

___

[18] Marriott asserts that it did not know which contracts would form the basis of Plaintiffs' class claims several years hence. Marriott Br. at 24–25. The facts are to the contrary. Plaintiffs specifically referenced those terms in their breach claims in the Consolidated Amended Complaint. JA530–31, at ¶¶ 322–23. And Marriott, represented by skilled and cautious lawyers, surely would not have overlooked Section 13.21 if it truly intended to invoke it to derail any class action purportedly barred by that section. Moreover, by its terms, Section 13.21 does not distinguish among types of class actions or even the scope of the requested class. Instead, it offers a categorical prohibition. Marriott could have invoked it, but deliberately chose not to. That was Marriott's decision unilaterally, as was the drafting of the contract terms.

In sum, Marriott's modus operandi throughout the entire course of this protracted litigation has been not only to ignore but to affirmatively violate the terms that it now claims should be binding on Plaintiffs. As the Supreme Court held in *Morgan*, "[w]aiver … 'is the intentional relinquishment or abandonment of a known right.'" 596 U.S. at 417 (quoting *United States v. Olano*, 507 U.S. 725, 733 (1993)). The district court properly found that Marriott's repeated and consistent conduct constituted waiver, regardless of what it might have asserted in passing in non-operative pleadings. Marriott's plea that contractually "agreeing to litigate 'individually' is not incompatible with an MDL," Marriott Br. at 25, has no legal foundation and cannot be reconciled with the myriad authorities discussed above—including those of the Supreme Court—that view MDL treatment as "consolidated" or "aggregate" treatment.

Moreover, under well-established doctrines of judicial estoppel, Marriott was not free to urge judicial management flatly inconsistent with Section 13.21 and then turn around and seek to enforce those same provisions in a manner directly contrary to its prior assertions. The Supreme Court has addressed the importance of judicial estoppel directly: "[W]here a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position, he may not thereafter, simply because his interests have changed, assume a contrary position, especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *New*

*Hampshire v. Maine*, 532 U.S. 742, 749 (2001) (quoting *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)); *see also Zinkand v. Brown*, 478 F.3d 634, 638 (4th Cir. 2007) ("Judicial estoppel is a principle developed to prevent a party from taking a position in a judicial proceeding that is inconsistent with a stance previously taken in court."). This is exactly what Marriott did: it successfully obtained MDL treatment by relying on the need to avoid conflicting class certification rulings, but now argues that no class action can be brought because of Section 13.21. It knew full well that disclosing to the JPML its view that class actions were barred by Section 13.21 would severely undermine its effort to seek MDL treatment. But now, as the district court noted, JA1662, it has done a complete about face because it is unhappy with the progress of the MDL.

Finally, while this Court need not reach the issue given Marriott's waiver, the district court was also correct in noting that the individual handling clause of Section 13.21 is independently invalid because it purports to "limit [the] Court's own authority…." JA1665. By requiring that the cases be "handled individually," the provision, by its terms, prohibits *the court* from conducting any form of aggregate treatment, such as *sua sponte* ordering consolidation of cases filed in the District of Maryland under Rule 42,[19] *sua sponte* making discovery applicable to multiple

---

[19] It is fundamental that a court may consolidate cases even when no party has made that request. *See, e.g.*, *Lester v. Exxon Mobil Corp.*, 879 F.3d 582, 592 (5th Cir. 2018) ("A district court is permitted to order consolidation pursuant to Federal Rule

cases, or creating a document depository to govern multiple cases. Having drafted this language, Marriott cannot ignore the plain meaning and argue that it intended to limit "handling" to the parties' conduct, not the court's conduct. Indeed, even that limitation would not make sense. It would then require Plaintiffs under the contract to *resist* any aggregate treatment ordered by the district court, even under threat of contempt. Again, such a provision cannot conceivably be enforceable.

Likewise, although it did not definitively rule on whether Section 13.21 was unconscionable, the district court noted that the provision was "adhesive." JA1670. The district court made numerous findings that support Plaintiffs' argument that Section 13.21 is both procedurally and substantively unconscionable. Those include (as to procedural unconscionability) the fact that the heading of Section 13.21 "makes no reference to individual handling of claims," and that "[t]he provision is buried on the last page of the Terms." *Id*. It is substantively unconscionable because it "purports to control the court's management of the litigation[.]" JA1659.[20]

---

of Civil Procedure 42(a) *sua sponte*"); *Holbrook v. Wexford Health Serv.*, No. 7:22-CV-00121, 2022 WL 4283090, at *1 (W.D. Va. Aug. 30, 2022) (same, citing authority).

[20] *See, e.g.*, *Fischer v. Gen. Elec. Hotpoint*, 438 N.Y.S.2d 690, 691 (N.Y. Dist. Ct. 1981) (finding contract unconscionable because "plaintiff was obviously at a substantially poorer bargaining position than the corporate defendant" and "defendant should have been aware that the plaintiff did not understand the significance of" certain contractual language); *McFarlane v. Altice USA, Inc.*, 524 F. Supp. 3d 264, 277 (S.D.N.Y. 2021) (finding an arbitration agreement to be unconscionable under New York law where it was written to cover all claims between the parties, including those arising outside of the contractual relationship);

More generally, the blunt fact is that no appellate court, certainly not the Supreme Court, has ever upheld a prohibition of this sort. The appellate case law affirming class action waivers arises overwhelmingly in the context of the availability of arbitration as an alternative and appropriate forum for the vindication of rights. *See AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011); *Am. Exp. Co. v. Italian Colors Rest.*, 570 U.S. 228 (2013). Even the sole appellate case cited by Marriott, *Convergys Corp. v. Nat'l Labor Relations Bd.*, 866 F.3d 635 (5th Cir. 2017), addresses not a class action waiver in the abstract but in the context of the aggregative rights protected under the National Labor Relations Act.

In the aftermath of *Concepcion*, courts have scrutinized and upheld scores of class action waivers. When the contractual provisions are clear, and when they are properly identified in a contract (as opposed to hidden in a sentence addressing other matters), and when the terms of the waiver are made clear (particularly in a contract of adhesion), they can be upheld. However, careless drafting means that the drafter cannot enforce the provisions at issue. This is particularly so here because the language is not merely a class action waiver; it prohibits anything other than "individual handling" of the litigation. Marriott was as uncareful in its drafting of its unilateral contract language as it was in its protection of data security.

---

*Eisen v. Venulum Ltd.*, 244 F. Supp. 3d 324, 345 (W.D.N.Y. 2017) (finding an arbitration agreement to be unconscionable under New York law where the clause mandated the application of British Virgin Islands law).

### B.     The Class Meets Standing Requirements Under Article III

#### 1.     Standing Under *TransUnion*

Setting aside Defendants' recent disclosure that credit card numbers and passport numbers were not actually encrypted despite years of representations to the contrary, and thus easily visible to the criminals who stole them (further supporting Plaintiffs' arguments that they were injured), the district court properly rejected Accenture's claim that class certification failed Article III because all class members did not share a common, class-wide injury. JA1232–33. As the Supreme Court has recognized, "[e]very class member must have Article III standing in order to *recover individual damages*." *TransUnion*, 594 U.S. at 431 (emphasis added). However, the Court refrained from deciding "whether every class member must demonstrate standing *before* a court certifies a class." *Id.* at 431, n.4 (emphasis in original). The Supreme Court did nothing to alter established law that, at class certification, "the standing inquiry focuses on the class representatives." 1 William Rubenstein, *Newberg on Class Actions* § 2:3 (6th ed. 2022); *Curtis v. Propel Prop. Tax Funding, LLC*, 915 F.3d 234, 240 (4th Cir. 2019) ("In a class action case, we look to the standing of the named plaintiff.").

Both before and after *TransUnion*, this Court has likewise declined to create a standing requirement for absent plaintiffs at class certification. *See, e.g.*, *Carolina Youth Action Project v. Wilson*, 60 F.4th 770, 779 (4th Cir. 2023) ("'[I]f a class

46

representative has standing' … 'the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing' to obtain class certification." (quoting 1 William Rubenstein, *Newberg on Class Actions* § 2:3 (6th ed. 2022))). Standing at class certification is decided by reference to the named plaintiff. *See Curtis*, 915 F.3d at 240. Accenture simply errs in arguing that *TransUnion* holds otherwise.

Moreover, as the district court held, the class representatives, and in fact all class members, have standing by virtue of having suffered concrete, particularized, and imminent injury traceable to Marriott and Accenture's failure to adequately safeguard their personal information and redressable by a favorable decision. JA796. Marriott's own notice to its customers alerted all individuals that they had to take proactive measures to protect their credit card and other private information, including monitoring their credit accounts for fraudulent charges.[21] And all were promised that, as guests, their private information would be protected. JA1227. The

---

[21] *See, e.g.*, *Marriott Announces Starwood Guest Reservation Database Security Incident*, Marriott International News Center (Nov. 30, 2018), https://news.marriott.com/news/2018/11/30/marriott-announces-starwood-guest-reservation-database-security-incident (updated Apr. 17, 2024 per ECF No. 1192 at 2); *Marriott Provides Update on Starwood Database Incident*, Marriott International News Center (Jan. 4, 2019), https://news.marriott.com/news/2019/01/04/marriott-provides-update-on-starwood-database-security-incident (updated Apr. 17, 2024 per ECF No. 1192 at 2).

fact that someone else may have paid for part or even all of the room does not negate the concrete injury Marriott caused by breaching its promise *to guests*.

In all events, the fact that some class members may ultimately prove not to have direct damages is not legally dispositive as to class certification. As the district court held, under well-settled law, the presence of a small number of uninjured absent class members is insufficient to defeat class certification. JA1233–34; *see, e.g.*, *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 452–53 (2016) (rejecting defendants' argument that no class can be certified when some class members may not have been injured); *accord Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 360–61 (1977) (class may be certified even if class members will later have to establish injury in separate proceedings).

Standing challenges are poorly suited to the facts of this case. All class members entered into a contract with Marriott (the SPG terms including the Privacy Statement), and all class members assert that Marriott breached its contract by failing to protect their personal information. JA528–33, at ¶¶ 312-28. A party to a breached contract has suffered a concrete injury-in-fact for standing purposes, regardless of whether the breach resulted in further economic injury. *See, e.g.*, *L-3 Commc'ns Corp. v. Serco, Inc.*, 673 F. App'x 284, 289 (4th Cir. 2016) ("[B]y 'alleg[ing] the existence of a contract, express or implied, and a concomitant breach of that contract, [the plaintiff's] complaint adequately show[ed] an injury to her rights' for purposes

48

of standing[.]" (quoting *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir. 2012)));

*Cernelle v. Graminex, LLC*, Nos. 21-1579/2649, 2022 WL 2759867, at *5 (6th Cir.

July 14, 2022) ("[I]njury from breach of contract does not require economic harm.").

Class members are entitled to nominal damages if they prevail on their breach of

contract claims. *See, e.g.*, *Hirsch Elec. Co. v. Comm. Servs., Inc.*, 145 A.D.2d 603,

605 (N.Y. App. Div. 1988) ("It is a well-settled tenet of contract law that even if the

breach of contract caused no loss… the injured party is entitled to recover… nominal

damages[.]" (cleaned up)); *accord, e.g.*, *Jones v. Hyatt Ins. Agency, Inc.*, 356 Md.

639, 648 (Md. 1999) (similar). It is "well established" that "a party whose rights are

invaded can always recover nominal damages without furnishing any evidence of

actual damage." *Uzuegbunam v. Preczewski*, 592 U.S. 279, 800 (2021) (quoting 1

T. Sedgwick, *Measure of Damages*, 71, n. a (7th ed. 1880)). Every class member

therefore has standing based on Marriott's breach of its contractual obligation to

provide adequate data security.

The district court limited the overpayment classes to include only "persons

who bore the economic burden for hotel room(s)." JA1236. The court further limited

the classes to those "who made reservations at Starwood properties during the four-

and-a-half-year period (2014-2018) in which hackers had access to Plaintiffs'

[personal identifying information]." *Id.* The district court did not certify class claims

of a loss of value of private information, only overpayment as a result of Marriott's

inadequate security.[22] Under the district court's modified definition, all class members indisputably suffered injury because they did not receive the promise they paid for.

### 2.    Unlike in *Beck,* Data Theft Has Occurred

Class members have suffered additional injury-in-fact sufficient to establish standing for their claims against both Marriott and Accenture. The district court correctly determined that the targeted theft of class members' personal data put them at imminent risk of identity theft. As the district court found, hackers sought out class members' personal information in the cyberattack. JA795. Additionally, multiple class members have already suffered identity theft and fraud. *Id.*

The district court's standing determination is fully consistent with *TransUnion*. Accenture focuses on dicta from *TransUnion* but neglects its actual holding. *TransUnion* involved a class of 8,185 consumers about whom a credit reporting firm had maintained misleading credit reports. 594 U.S. at 421. The Supreme Court considered whether the class members had standing to recover

---

[22] Accenture asserts that the sole theory of harm Plaintiffs advanced as to Accenture was the loss of market value of class member's personal information. Accenture Br. at 7. This is incorrect. The district court found that Plaintiffs had standing to sue Accenture based on "(1) their allegations of actual and threatened harm in the form of identity theft; (2) their alleged loss in time and money spent to mitigate the harm; (3) their alleged loss in value of their personal information; and (4) their benefit-of-the-bargain and overpayment theories." *In re Marriott Int'l, Inc., Customer Data Sec. Breach Litig.*, No. 19-md-2879, 2020 WL 6290670, at *5 (D. Md. Oct. 27, 2020); ECF No. 671 at 9. Together and separately, these harms satisfy Article III.

damages from the credit reporting firm. *Id.* at 422. The Court held that 6,332 of the class members had not suffered concrete harm for purposes of Article III as their inaccurate files had not been provided to third parties. *Id.* at 437. However, the Court affirmed the standing of 1,853 class members whose reports TransUnion had sent to third parties. *Id.* at 433. The Court held that the risk of harm to those 1,853 class members had "materialized" as a result of the dissemination of their credit reports. *Id.* at 437–39. As such, the plaintiffs had suffered concrete injury in fact. *Id.* at 433. The Court found standing even though TransUnion noted there was no proof creditors who received the erroneous reports even read them, let alone relied upon them for adverse credit decisions. Brief of Petitioner, *TransUnion*, 2021 WL 409753, at *42.

All class members here are in the position of the 1,853 class members in *TransUnion* who were found to have standing. The harm to all class members has materialized: hackers targeted, stole, and retained their personal information. Decisions by federal appellate courts since *TransUnion* have found such harm sufficient for purposes of Article III standing. *See, e.g.*, *Bohnak v. Marsh & McLennan Cos., Inc.*, 79 F.4th 276, 280 (2d Cir. 2023); *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 375 (1st Cir. 2023); *Clemens v. ExecuPharm Inc.*, 48 F.4th 146, 156 (3d Cir. 2022); *cf. O'Leary v. TrustedID, Inc.*, 60 F.4th 240, 244 (4th Cir. 2023) (finding no standing where identity theft protection company may have

51

disclosed too many Social Security digits, but making clear that "Article III excludes plaintiffs who rely on an abstract statutory privacy injury *unless it came with a nonspeculative increased risk of identity theft*") (emphasis added).

Accenture's invocation of *Beck* is flawed. Accenture Br. at 2. In *Beck*, this court held that the "mere theft" of a laptop and medical files containing personal information "without more" (such as a specific targeting of private information in the theft) was insufficient to confer Article III standing. *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017). Here, data thieves targeted and stole personal information itself. JA795. Further, class members have suffered the requisite "more." As the district court explained, targeting of personal information and theft of other class members' identities "push the threatened injury of future identity theft beyond the speculative to the sufficiently imminent." JA796 (quoting *Beck*, 848 F. 3d at 274). This court has previously recognized as much after *Beck*. *See Hutton v. Nat'l Bd. of Examiners in Optometry, Inc.*, 892 F.3d 613, 622 (4th Cir. 2018) (holding that plaintiffs had shown a non-speculative threat of future identity theft where personal information was targeted in a data breach and some plaintiffs had already suffered identity theft).

In its November 30, 2018 notice to Starwood guests, Marriott itself recognized the harm that its entire customer base, necessarily including all class members, had suffered. Marriott provided class members with free access to a service that would

alert them if their personal information appeared on the internet. *See supra* n.21. Additionally, Marriott encouraged class members to monitor their Starwood Preferred Guest account for "suspicious activity" and review their credit card statements for unauthorized activity.[23] Marriott's own communications to class members refute its argument here that the class members suffered no injury. As the district court made clear, Marriott's customers need not "wait until they, too, suffer identity theft" to bring their claims. JA796. Every class member has standing based on the completed fact of data theft and the ensuing imminent risk of identity theft.

And, as noted above, the district court's holding that standing was supported by Plaintiffs' imminent risk of identity theft is further reinforced by Marriott's belated and stunning admission, only days ago, that customers' credit card data was never properly encrypted. *See* ECF No. 1181. While a finding of imminent harm was true even where some of the data may have been encrypted, it is even more convincing where, in reality, there were only substandard protections safeguarding much of that data.[24]

---

[23] *Starwood Guest Reservation Database Security Incident* (Nov. 30, 2018), https://ago.vermont.gov/sites/ago/files/wp-content/uploads/2018/12/2018-11-30-Marriott-International-Notice-of-Data-Breach-to-Consumers.pdf.

[24] Furthermore, as the threatened harm of identity theft is sufficiently imminent, Plaintiffs have suffered injury-in-fact for the time and money spent to mitigate this harm. *See Hutton*, 892 F.3d at 622 ("Because the injuries alleged by the Plaintiffs are not speculative, the costs of mitigating measures to safeguard against future identity theft support the other allegations and together readily show sufficient

### C.    The Class Is Ascertainable

Marriott does not dispute that the class definition is objective and clear. However, Marriott attempts to challenge the administrative feasibility of identifying class members (the so-called heightened ascertainability requirement). The district court conducted a careful and thorough review of the process for ascertaining class members, painstakingly reviewed the applicable law—including case law from this Circuit and the Third Circuit, which originated the doctrine and applies it most stringently—and concluded that the heightened ascertainability requirement is readily met here. That ruling is not an abuse of discretion and should be affirmed. *Career Counseling, Inc*, 91 F.4th at 212 (applying abuse of discretion standard to district court ruling on heightened ascertainability).[25]

 As the district court recognized, JA1239, Marriott's database enables the parties to identify all class members. Rarely is ascertainability even raised by a

---

injury-in-fact to satisfy the first element of the standing to sue analysis."). As the district court explained, "the two theories of injury-in-fact stand or fall together." JA797. Indeed, as noted, in Marriott's own notice to its customers, it acknowledged the need to take mitigating steps because of the completed data theft. *See supra* n.21.

[25] Plaintiffs acknowledge that this Circuit has adopted a heightened ascertainability requirement as part of the Rule 23(a) inquiry, but they preserve the argument, embraced by most Circuits, that the requirement is not supported by the text or policy of Rule 23(a). *See, e.g.*, *Cherry v. Dometic Corp.*, 986 F.3d 1296, 1301–05 (11th Cir. 2021) (Pryor, C.J.) (rejecting ascertainability after a thorough analysis of the case law). *Cf. Career Counseling*, 91 F.4th at 208 (three-judge panel cannot overrule prior panel holding that heightened ascertainability requirement exists under Rule 23).

defendant as an issue when the entire class is identified from a defendant's own business records. The record is clear that Marriott treated its customer lists as an undifferentiated class of victims and advised identical remedial measures among all of them. *See* JA492, at ¶ 199 ("Defendants admit that Marriott started sending email notification on a rolling basis to guests who had email addresses with the affected tables following the November 30, 2018 press release. Defendants further admit that Marriott completed issuing notification to all valid domestic guest email addresses on December 11, 2018."). In initially certifying this class, Judge Grimm expressly found that Marriott's "database is a strong starting point from which to identify class members" and that this case is distinct from other ascertainability controversies because "Marriott actually has this data[.]" JA1239, n.14.

Here, class membership is defined as a subset of the very list that Marriott used to notify prospective class members of the data breach. As the court below noted, Marriott "certainly viewed the database as reliable enough for [the] notification process" and thus cannot claim that the information is unreliable. JA1240. This case is the polar opposite of the classic ascertainability situation: a consumer action involving small payments, no receipts, and no way to even begin identifying class members.[26] In the present case, Marriott's own database does most

---

[26] *See, e.g.*, *Carrera v. Bayer Corp.*, 727 F.3d 300, 309–10 (3d Cir. 2013) (finding that a consumer class was not ascertainable where there was "no evidence that retailers even have records for the relevant period" and "deposition testimony

of the heavy lifting, with additional narrowing facilitated by the various case management mechanisms noted by the district court.

The only conceivable issue arises from the fact that the court narrowed the class to include only those who bore the economic burden of their hotel stays. But the district court addressed that circumstance at length and did not abuse its discretion in concluding that narrowing the class in this fashion did not raise a serious ascertainability concern at this stage. In so doing, the court articulated three crucial legal principles that Marriott ignores. First, contrary to Marriott's suggestion, the ascertainability requirement "'does not suggest that *no* level of inquiry as to the identity of class members can ever be undertaken.'" JA1238 (quoting *Byrd v. Aaron's Inc.*, 784 F.3d 154, 171 (3d Cir. 2015) (emphasis in original)). "'If that were the case, no Rule 23(b)(3) class could ever be certified.'" *Id.* Second, "'the need to review individual files to identify [class] members [is] not [a] reason[] to deny class

---

suggested that individuals will have difficulty accurately recalling their purchases"); *In re Processed Egg Prod. Antitrust Litig.*, 312 F.R.D. 124, 138 (E.D. Pa. 2015) (holding that a consumer class was not ascertainable in part because there where "no objective records to identify class members"); *Bello v. Beam Glob. Spirits & Wine, Inc.*, No. CIV. 11-5149 NLH/KMW, 2015 WL 3613723, at *11–14 (D.N.J. June 9, 2015) (finding that a consumer class was not ascertainable in part because it was "unlikely that many, if any, class members have retained a receipt for their purchases"); *Weiner v. Snapple Beverage Corp.*, No. 07 CIV. 8742 DLC, 2010 WL 3119452, at *12–13 (S.D.N.Y. Aug. 5, 2010) (finding that a consumer class was not ascertainable as there was "no basis to find that putative class members will have retained a receipt, bottle label, or any other concrete documentation of their purchases").

certification.'" *Id.* (quoting *Byrd*, 784 F.3d at 171). Third, "Plaintiffs can use affidavits to help ascertain the class." JA1241 (citing *City Select Auto Sales Inc. v. BMW Bank of N. Am. Inc.*, 867 F.3d 434, 441 (3d Cir. 2017)). Any concerns about fraudulent affidavits are minimized where, as here, the amount of recovery at issue "'is so small that it is unlikely to induce fraudulent claims,'" and where "'class members can obtain objective records with relative ease that would confirm their membership in the class[.]'" JA1242 (quoting *Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. 675, 692 (N.D. Ga. 2016)).

Based on these principles, the district correctly found that "Plaintiffs have adequately shown—at this stage in the proceedings—that any review in this case is administratively feasible and not the kind of administrative review that would preclude ascertainability." JA1242. The court explained that Plaintiffs can use self-certification, and cross check affidavits against the Marriott database, "which can confirm whether a reservation was made, the dates of that reservation, the payment card used, etc." JA1241. The court also noted that if the database "lack[s] corroborating information, Plaintiffs [can] also use class members' own records such as receipts and bank and credit card statements as an informational supplement." *Id.*[27]

---

[27] The district court's careful analysis comports with this Court's case law. Contrary to Marriott's suggestion, Marriott Br. at 42, this Court did not find that the class in *EQT* failed ascertainability. Rather, it remanded the case so the district court could

In numerous analogous circumstances—involving (as here) the use of affidavits in combination with a defendant's records or class members' receipts— courts have found ascertainability to be satisfied.[28] Apart from confirming the precise approach taken by the district court here, those cases refute Marriott's specious argument that use of affidavits for ascertainability purposes would violate its due process rights.[29] Marriott Br. at 48.

---

"give greater consideration to the administrative challenges" in ascertaining class members. *EQT Prod. Co. v. Adair*, 764 F.3d 347, 360 (4th Cir. 2014). Here, the district court has already thoroughly analyzed the administrative challenges, as required by *EQT. See also Career Counseling*, 91 F.4th at 212 (finding no abuse of discretion in district court's ruling that plaintiffs failed ascertainability in light of the district court's consideration of "'the totality of evidence'") (quoting district court)).

[28] *See, e.g.*, *Hargrove v. Sleepy's LLC*, 974 F.3d 467, 480 (3d Cir. 2020) (holding that affidavits from class members, in combination with the defendant's business records, constituted a "reliable and administratively feasible mechanism" for ascertaining class members); *In re Delta/AirTran Baggage Fee Antitrust Litig.*, 317 F.R.D. at 692 (finding a proposed class to be ascertainable via the use of class members' receipts, credit card statements, and affidavits); *Donovan v. Philip Morris USA, Inc.*, 268 F.R.D. 1, 9–10 (D. Mass. 2010) (finding a proposed class to be ascertainable via the use of class member affidavits and the defendant's business records); *see also City Select Auto Sales Inc.*, 867 F.3d at 441 ("Affidavits, in combination with records or other reliable and administratively feasible means, can meet the ascertainability standard.").

[29] Marriott cites dictum from a 2015 Eleventh Circuit case, but that Circuit subsequently rejected any ascertainability requirement under Rule 23(a). *See Cherry*, 986 F.3d at 1304. Marriott also cites dictum from a 2012 Third Circuit case, but the Third Circuit subsequently approved the use of affidavits, along with other reliable and administratively feasible evidence. *City Select Auto Sales*, discussed *supra* n. 28.

A useful analogy is case law in which courts certified student claims for tuition reimbursement for classes suspended during COVID. In most instances, courts certified these as class actions even though students may have received full or partial tuition reimbursement from family or scholarships, fully analogous to the need to determine the hotel guests responsible for at least some portion of their own accounts. *See, e.g.*, *Ninivaggi v. Univ. of Delaware*, No. 20-CV-1478-SB, 2023 WL 2734343 (D. Del. Mar. 31, 2023) (certifying a class of enrolled students "who paid tuition"); *Schultz v. Emory Univ.*, No. 1:20-CV-2002-TW.T, 2023 WL 4030184, at *3 (N.D. Ga. June 15, 2023) ("[T]hough the Emory records do not specifically identify the individual people paying Emory tuition and fees on behalf of others in [Emory's payment portal], such individuals are surely capable of determination, albeit inconveniently…. But such an endeavor does not make the class inherently incapable of determination."); *Eddlemon v. Bradley Univ.*, 616 F. Supp. 3d 819 (C.D. Ill. 2022), *vacated and remanded on other grounds*, 65 F.4th 335 (7th Cir. 2023) (certifying a class of those who paid tuition or on whose behalf tuition was paid). By contrast, where the class encompassed all parties who may have paid any portion of tuition, one court denied certification on the grounds that university records would provide no defining universe of potential class members.[30] Once

---

[30] *See Evans v. Brigham Young Univ.*, No. 1:20-CV-100-TS, 2022 WL 596862 (D. Utah Feb. 28, 2022), *aff'd*, No. 22-4050, 2023 WL 3262012 (10th Cir. May 5, 2023) (finding no abuse of discretion). *Evans* can be distinguished because of the inclusion

again, this highlights the importance of Judge Grimm's finding that the class emerges entirely from within Marriott's database and that, unlike cases in which there are class members who cannot be identified from the defendant's records, "Marriott actually has this data[.]" *See* JA1239, n.14.

Marriott's far-reaching argument, if accepted, would shield it from ever being sued on a class basis for recovery of hotel room payments. Virtually every hotel company rents rooms both to individuals who bear the ultimate cost (*e.g.*, vacation travelers) and those whose costs are paid for or reimbursed by others (*e.g.*, business travelers). Under Marriott's approach, a class that includes the latter would violate Article III, but a class that excludes the latter would violate ascertainability. Such blanket immunity for Marriott and other hotel companies cannot possibly be the law.

Finally, cautious of the need to move incrementally, the district court noted that it would "carefully monitor any developments related to the [Marriott] database and other methods of class member identification to ensure continued administrative feasibility," and that the court might decertify "'if an ascertainability issue eventually becomes 'truly insoluble….'" JA1242–43 (quoting authority). Marriott

in the class of persons not discernible from the defendant's official records. *See Ninivaggi v. Univ. of Delaware*, No. 20-CV-1478-SB, 2023 WL 2734343, at *2 (D. Del. Mar. 31, 2023) ("[T]he class [in *Evans*] was defined as '*all people* who paid tuition.' … Here, by contrast, the class is limited to 'students' who paid tuition, whatever its ultimate source. Because U. Delaware has records of those payments, the class is administratively feasible." (citations omitted) (emphasis in original)).

can always lodge an appeal after final judgment if it believes that, as the process unfolded, the district court erred in refusing to decertify the class.

In short, the district court found ascertainability satisfied only after a careful review of the facts, application of the most stringent case law, and the caveat that it was open to reconsidering the issue if the administrative burden proved to be too great. Such a fact-based and well-reasoned analysis is not an abuse of discretion.

### D. The District Court Properly Certified a Rule 23(c)(4) Class Against Accenture and Marriott

With respect to their negligence claims, Plaintiffs proposed an issue class under Rule 23(c)(4) related to duty (common law or statutory), breach, and causation. The district court adopted what it called the "broad view" of Rule 23(c)(4). JA1286–87. It analyzed the issues under Rule 23(a) and Rule 23(b)(3), but it focused its predominance analysis on the particular issues rather than adopting the "narrow" view of analyzing predominance based on the case as a whole. After undertaking that analysis, the court determined that it would certify an issue class on the issues of duty and breach but not on the issue of causation, finding that predominance was not satisfied on the question of causation. A critical aspect of the court's ruling was that it had certified damages classes against Marriott, so "the Court will already be analyzing the intertwined factual circumstances relevant to the duty of breach issues." JA1291.

This Court reversed the district court's Rule 23(c)(4) ruling on duty and breach. It explained that, because it was vacating the Rule 23(b)(3) certification involving Marriott (to consider in the first instance the issue of waiver), the foundation for the district court's (c)(4) superiority finding (the intertwined nature of the (b)(3) and (c)(4) classes) no longer applied. Thus, it vacated the (c)(4) certification as well. Because on remand from this Court, the district court found that Marriott was foreclosed from relying on Section 13.21's language requiring that cases be handled on an individual basis, it reinstated the prior Rule 23(b)(3) certification and thus, given the renewed applicability of Judge Grimm's superiority reasoning regarding the Rule 23(c)(4) class, re-certified the (c)(4) class.

As the district court recognized in initially certifying issues under (c)(4), there are two potential views of how to apply Rule 23(c)(4): the narrow one (which still requires a court in a (b)(3) class to consider predominance for the case as a whole) and the broader one (requiring consideration of predominance only with respect to the issue certified).[31] The district court applied the broad approach, explaining that

---

[31] Plaintiffs do not argue for, and the district court did not rely upon, a freestanding Rule 23(c)(4) certified class that does not require any consideration of Rule 23(a) or (b)(3). *See, e.g.*, *Harris v. Med. Transp. Mgmt.*, 77 F.4th 746, 758 (D.C. Cir. 2023) ("Rule 23's text and structure offer no quarter to the view that Rule 23(c)(4) creates an independent type of class action that is freed from all of Rule 23's other class-action prerequisites."). Oddly, Accenture argues for such freestanding certification, but based on a rule of its own invention, completely bereft of citation. *See* Accenture Br. at 36 ("[I]f element-by-element issue classes are permitted, injury must be one of the 'elements' certified for common class treatment."); *see also id.* at 32 ("[T]he

62

the Circuits were "coalesce[ing] around that view. JA1286. In its opinion, however, this Court did not decide the issue, *In re: Marriott Int'l, Inc.*, 78 F.4th at 678, although it did conclude that superiority "takes on special importance" in a (c)(4) class. *Id.* at 689.

Plaintiffs first explain why this Court should adopt the broad view of Rule 23(c)(4). Plaintiffs then explain why, under that view, the district court did not abuse its discretion in certifying a (c)(4) class on duty and breach. Finally, Plaintiffs explain why Defendants' arguments against (c)(4) certification are meritless.

### 1.    This Court Should Adopt the Broad View of Rule 23(c)(4)

The Circuits have uniformly adopted the broad view of Rule 23(c)(4), and Defendants do not seriously urge this Circuit to be the lone exception. Indeed, while this case has been pending, additional Circuits have opted for the broad view.

For example, last year, the Tenth Circuit was faced with the identical issue that this Court now faces: whether to adopt the broad or narrow view of Rule 23(c)(4). *Black v. Occidental Petroleum Corp.*, 69 F.4th 1161 (10th Cir. 2023). The court chose the broad approach after carefully reviewing the opinions of other Circuits.

---

rule allows courts to certify classes that would try all elements of liability in common.…").

It noted that "nearly all other circuits that have interpreted Rule 23(c)(4) agree issue class certification is appropriate when the issue class itself satisfies the requirements of Rule 23(a) and the predominance and superiority requirements of Rule 23(b)(3)." *Id.* at 1186.[32] It noted that the Third Circuit had also endorsed a broad approach, although that Circuit considered a non-exclusive list of factors in ruling on a proposed issues class. *Id.* at 1187 (first citing *Russell v. Educ. Comm'n for Foreign Med. Graduates*, 15 F.4th 259, 270 (3d Cir. 2021) and then citing *Gates v. Rohm & Haas Co.*, 655 F.3d 255, 273 (3d Cir. 2011)).

According to the Tenth Circuit, "[o]nly the Fifth Circuit has applied Rule 23(c)(4) to require that the entire cause of action, not just the contemplated issue class, meet the predominance requirement." *Id.* (citing *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996)). But the Tenth Circuit further noted that "the Fifth Circuit has since indicated its retreat from this application and toward embracing the same perspective as the majority of circuits to have addressed the

---

[32] The Tenth Circuit cited *In re Nassau Cnty. Strip Search Cases*, 461 F.3d 219, 226–27 (2d Cir. 2006); *Martin v. Behr Dayton Thermal Prods. LLC*, 896 F.3d 405, 413 (6th Cir. 2018); *In re Allstate Ins. Co*., 400 F.3d 505, 508 (7th Cir. 2005); and *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996). It also cited this Court's decision in *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d 417, 441 (4th Cir. 2003), although as noted, in its prior opinion in this case, rendered 20 years after *Gunnells*, this Court determined that this Circuit had not definitively chosen between the broad and narrow approaches.

issue." *Id.* (citing *In re Deepwater Horizon*, 739 F.3d 790, 816 (5th Cir. 2014) and *Steering Comm. v. Exxon Mobil Corp.*, 461 F.3d 598, 603 (5th Cir. 2006)).

Even more recently, the District of Columbia Circuit also held that in a (c)(4) class, predominance focuses on the issue certified, not the case as a whole. *Harris*, 77 F.3d 746 ("In undertaking the predominance inquiry on remand, the district court must ensure that the common questions *within the certified issues* predominate over any individual ones." (emphasis added)). In short, since the footnote in *Castano*, every Circuit, including the Fifth Circuit itself, has taken a broad view of Rule 23(c)(4).

This consensus among the Circuits in favor of the broad approach should not be surprising. Adopting the narrow approach to Rule 23(c)(4)—requiring an analysis of predominance for the case as a whole—would render (c)(4) superfluous, contrary to basic principles of statutory construction. *See, e.g.*, *Nassau Cnty.*, F.3d at 226–27 (citing, among other cases, *Gunnells*, 348 F.3d at 439) ("[A] court may employ Rule 23(c)(4)(A) … where the entire claim does not satisfy Rule 23(b)(3)" in light of "the rule's plain language and structure," and the "well-settled principle that courts should avoid … render[ing] provisions superfluous."); *see also* Herbert B. Newberg & William B. Rubenstein *et al.*, 2 *Newberg & Rubenstein on Class Actions* § 4:90 (6th ed. 2022) ("[U]ltimately, courts were persuaded that requiring predominance as

to the cause of action as a whole … might render Rule 23(c)(4) superfluous, violating a fundamental canon of statutory interpretation.").

> **2.    Under the Broad View of Rule 23(c)(4), the District Court Did Not Abuse Its Discretion in Certifying an Issue Class on the Issues of Duty and Breach**

This Court reviews the district court's issue certification ruling under a deferential abuse of discretion standard. *See, e.g.*, *Harris*, 77 F.4th at 757 (applying abuse of discretion standard); *Martin v. Behr Dayton Thermal Prod. LLC*, 896 F.3d 405, 413–16 (6th Cir. 2018) (same). The district court conducted a careful and nuanced analysis, resulting in certification of an issue class on two of the three issues proposed by Plaintiffs. The court found all of the Rule 23(a) elements were satisfied. It further found that Rule 23(b)(3) predominance was satisfied for the issues certified. And it found that Rule 23(b)(3) superiority was satisfied because the certified issues were intertwined with the (b)(3) class certified as to Marriott, thus making a (c)(4) class especially efficient.

The court acknowledged that issues involving causation, affirmative defenses, and damages would not be resolved by the issues class, but explained that if it did not certify the issues of duty and breach, "[t]he parties would have to repeatedly put on the same witnesses and produce the same documents, incurring considerable expense." JA1291.

Moreover, while Plaintiffs could not declare victory on the underlying negligence claims by winning on the certified issues, a victory by Marriott and Accenture would eliminate the negligence-related claims *in toto*. As the court recognized, "in the event that the results of the issues trials are favorable to Marriott and Accenture, the litigation against them as to the negligence and negligence per se claims would end." JA1291–92.

Finally, the court emphasized that (c)(4) certification was uniquely appropriate here: because the court had certified damages classes against Marriott, "[n]ot certifying the duty and breach classes would result in totally unnecessary duplication." JA1291. Appellants do not come to grips with this fundamental point. The certified (c)(4) class turns only on matters that are already *sub judice* in the certified (b)(3) class. The district court did not find that there could be standalone (c)(4) certification in this case. Rather, it relied heavily on the overlapping Rule 23(b)(3) class that would be tried simultaneously. Consequently, the arguments for certifying a (c)(4) class here were much stronger than in the many cases certifying stand-alone (c)(4) classes; here, it would make little sense *not* to have an issues trial given the overlapping nature of the (b)(3) and (c)(4) trials.

The district court's reasoning is careful and addresses all of the relevant considerations. There is no valid basis for arguing that the court abused its discretion.

### 3.  Defendants' Challenges to the Rule 23(c)(4) Certification are Meritless

In challenging the (c)(4) certification, Defendants all but ignore the efficiencies derived from the simultaneous (b)(3) and (c)(4) trials. Instead, they focus almost entirely on supposed restrictions to (c)(4) certification that they invent out of whole cloth and that are not supported by the text, Advisory Committee Notes, or case law.

First, Defendants contend that (c)(4) cannot be used to "try only *elements* of claims." Accenture Br. at 41 (emphasis in original). But no such limitation is contained in (c)(4). The rule simply allows, "[w]hen appropriate," certification of "a class action with respect to particular *issues*." (emphasis added). The drafters could have, but did not, limit (c)(4) to entire claims. Nothing in the text suggests any restriction on trying elements of claims. Nor is there even a hint of such a limitation in the Advisory Committee Notes. Defendants cite no case for such a limitation, and numerous cases specifically refute Defendants' narrow interpretation of (c)(4). *See, e.g.*, *Harris*, 77 F.4th at 762 (recognizing the broad types of issues that are potentially suitable for issue class treatment, including "an affirmative defense applicable to a large number but not all class members"); *Russell*, 15 F.4th at 270 (holding "district courts may certify 'particular issues' for class treatment *even if those issues, once resolved, do not resolve a defendant's liability*") (emphasis added); *Good v. Am. Water Works Co., Inc.*, 310 F.R.D. 274, 296 (S.D.W. Va. 2015) ("There is no

68

impediment to certifying particular issues as opposed to entire claims or defenses.");
*In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS),
2022 WL 3971006, at *5 (S.D.N.Y. Aug. 31, 2022) ("Courts have authority to certify
issues narrower than 'liability' as a whole in order to 'home in on threshold class-
wide inquiries.'" (quoting *In re Petrobras Sec.*, 862 F.3d 250, 374 (2d Cir. 2017));
*Manual for Complex Litigation* § 21.24 (4th ed. 2004) (similar).

Second, for the same reason, there is no support for Defendants' alternative
argument that (c)(4) is limited to "try[ing] all elements of liability" or "a given cause
of action" in its entirety. Accenture Br. at 42, 43. Defendants contend that their
reading of (c)(4) is the "most sensible" one, but that argument defies logic given the
Rule's use of the term "issue" and Defendants' failure to cite anything in the text,
Advisory Committee Notes, or case law to support such a limitation. Indeed, the
only "support" Defendants offer is the Notes' discussion of an issue class
certification of liability in a fraud case. Accenture Br. at 42-43. But they
misleadingly omit the fact that the Notes cite this as an "*example*." Fed. R. Civ. P.
Adv. Comm. Note Rule 23 (emphasis added). The fact that this is offered only as an
*example* refutes Defendants' argument that the discussion represents the outer limit
of (c)(4) certification; and no court has interpreted this example as setting any
boundary. Again, to the contrary, many courts have certified issue classes that do
not fall within the limited parameters that Defendants proffer with no legal support.

*See, e.g.*, *Martin*, 896 F.3d at 416 (affirming (c)(4) class certification over defendant's argument that "resolution of the certified issues 'will not resolve the question of [d]efendants' liability either to the class as a whole or to any individual therein'"); *In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 407 F. Supp. 3d 422, 436 (S.D.N.Y. 2019) (granting (c)(4) certification as to issues short of liability); *Coe v. Cross-Lines Ret. Ctr., Inc.*, No. 22-2047-EFM, 2023 WL 3664921, at *7 (D. Kan. May 24, 2023) ("[N]othing in Rule 23(c) prevents the certification of issues that do not fully resolve a defendant's liability.")

Third, Defendants contend that if this Court does not accept their other proposed limitations on Rule 23(c)(4), it should at least limit (c)(4) to "the essential element of injury[.]" Accenture Br. at 45. But again, putting aside the vagueness of the proposed "essential element of injury" test, Defendants cite nothing to support such a limitation. Instead, based on no (c)(4) case law, they claim that such a reading is compelled by Article III of the Constitution. Accenture Br. at 47. But as discussed *supra*, every class member has alleged traceable injury attributable to Defendants' conduct: the theft of their personal information, along with the imminent risk of identity theft. In any case, the issue classes will not allow any class member to recover damages; class members will be required to prove their damages in follow-on trials. Not surprisingly, no authority supports Defendants' argument that Article III compels courts to ignore the plain language of (c)(4).

Fourth, Defendants contend that the district court's (c)(4) certification violates superiority under Rule 23(b)(3). It does not. Defendants cannot conceivably argue that the alternative to an issues class—trying the same issues thousands of times—is superior to one issues class trial. Rather, it simply ignores (b)(3)'s command that superiority addresses whether a class action is "superior to other available methods for fairly and efficiently adjudicating the controversy." Instead, Defendants resurrect the same flawed limitations that they try to read into Rule 23(c)(4), i.e., that an issues class is never superior unless it resolves entire claims. Accenture Br. at 49. But nothing in the text of Rule 23(b)(3) imposes such a limitation, and no court has held that as a matter of *superiority*, issue classes should never be certified unless they resolve entire claims as opposed to issues. The only authority that could conceivably support such a limitation is the lone footnote in the Fifth Circuit's *Castano* opinion, discussed *supra.* But Defendants wisely refrain even from citing *Castano*, no doubt because the case has been discredited by every Circuit that has defined the contours of issue classes, including post-*Castano* cases from within the Fifth Circuit.

Also meritless is Defendants' argument that the issues class would violate the manageability component of superiority. The district court is fully capable of adjudicating the designated issues without "individualized issues … seep[ing] into the class proceeding…." Accenture Br. at 54. Indeed, the issue classes that have gone to trial have refuted the shopworn arguments by corporate defendants that such

proceedings will be unmanageable. For example, in *In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d 838, 859–61 (6th Cir. 2013), defendant complained that an issues trial would be unmanageable. Rejecting that argument, the district court had no difficulty trying the designated issues. After an issues class trial on the certified issue of liability, the defendant obtained a binding class-wide determination of no liability, precisely the outcome that would occur if Defendants here were to prevail on the (c)(4) issues. *See In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, No. 1:08-WP-65000, 2015 WL 11995255, at *1 (N.D. Ohio Feb. 18, 2015).

Finally, Defendants argue that trial of an issues class would violate their rights under the Seventh Amendment Reexamination Clause. Accenture Br. at 55. That argument is meritless. Courts have repeatedly rejected similar arguments. *See Martin*, 896 F.3d 405, 416–17; *In re Suboxone (Buprenorphine Hydrochloride & Nalaxone) Antitrust Litig.*, 421 F. Supp. 3d 12, 76 n.32 (E.D. Pa. 2019), *aff'd sub nom. In re Suboxone (Buprenorphine Hydrochlorine & Naloxone) Antitrust Litig.*, 967 F.3d 264 (3d Cir. 2020); *Mullen v. Treasure Chest Casino, LLC*, 186 F.3d 620, 628–29 (5th Cir. 1999). "[T]he Seventh Amendment prohibition is not against having two juries review the same evidence, but rather having two juries *decide* the same essential issues." *In re Paoli R.R. Yard PCB Litig.*, 113 F.3d 444, 452 n.5 (3d

Cir. 1997) (emphasis added). Only the juries in follow-on cases will decide issues of individuals' injuries.[33]

At bottom, contrary to Defendants' argument, the district court thoroughly demonstrated why superiority is satisfied here, and its analysis is not an abuse of discretion.

In the end, Defendants are left with no challenge to the (c)(4) certification other than their own invented and legally unsupported limitations. The district court did not abuse its discretion in rejecting Defendants' arguments, especially in light of the tangible efficiencies given the overlapping (b)(3) class.

### E.    Plaintiffs' Proof Satisfies *Comcast*

#### a.    Marriott Misreads *Comcast*

Finally, Marriott turns at the end of its brief to an odd argument about whether a claimed insufficiency of proof runs afoul of *Comcast*, 569 U.S. 27. Here Marriott does not challenge the admissibility of Plaintiffs' expert testimony under *Daubert*, 509 U.S. 579, but instead claims that *Comcast* requires that damages be established

---

[33] Equally meritless is Defendants' speculation that the issue trial will get bogged down by choice-of-law problems. Accenture Br. 56–57. Ironically, this argument requires Defendants to ignore the choice of law provision of Section 13.21. Moreover, the existing bellwether structure is state-specific and limited to a small number of states. And if there is a multistate trial, the jury can be instructed on the different states' laws, which likely can be grouped. *See, e.g.*, *In re FCA US LLC Monostable Electronic Gearshift Litig.*, 16-md-02744 (E.D. Mich. Sept. 16, 2022) (district court submitted certified questions to jury state by state); *id.*, ECF No. 853 (Sept. 20, 2022).

on a classwide basis. Marriott Br. 51-52 ("*Daubert* admissibility may be necessary for a damages model to meet Rule 23, but it is not sufficient to satisfy *Comcast*."). While Marriott tried to smuggle in a *Daubert* argument when last before this Court, *see* Marriott's First Br. at 54, n.6, that argument is not preserved in this appeal.[34] Rather, Marriott rests its argument entirely on a merits claim that their expert has demonstrated superior evidence regarding a supposed "key" assumption on how to assess whether hotel prices move sufficiently in tandem to allow a measure of the overpayment for Marriott hotel rooms.

The heart of the argument is that applying this methodology to all class members would require large numbers of applications of the data. Marriott Br. 53, n.6 ("[I]f Dr. Prince's co-movement premise is wrong, then he would need to run his model millions of times, not a 'few' times—a process that is unworkable."). From this starting point, Defendants claim that *Comcast* requires that one set of calculations must yield the exact damages amount of each class member and the Prince model cannot provide a methodology for class damages.[35] There is simply no support for this interpretation of *Comcast* or the subsequent conclusion.

---

[34] The most Marriott is able to contend is that this Court is "entitled to review the *Daubert* ruling" even though Marriott is not asking for such review. Marriott Br. at 56, n.8. But telling a court that it can decide an issue not argued by the party itself does not constitute preservation of the issue.

[35] Amicus Chamber of Commerce dutifully repeats each argument made by Marriott, but conspicuously does not even try to defend this one.

Indeed, this Court has already stated as much. In analyzing *Comcast* in relation to predominance, this Court rejected the argument that "damages must be susceptible of measurement across the entire class for purposes of Rule 23(b)(3)." *In re Zetia (Ezetimibe) Antitrust Litig.*, 7 F.4th at 237 (quoting *In re Modafinil Antitrust Litig.*, 837 F.3d 238, 260 (3d Cir. 2016)); *see also id.*at 238 ("[E]ven if some individualized-injury inquiry is ultimately required at trial for some defendants, common issues will still predominate."). Again, Marriott fails even to cite *Zetia*, once again omitting controlling authority that counters its representations to this Court.

Nor is this Circuit an outlier in refusing to read *Comcast* as Marriott would have it. *See Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 408 (2d Cir. 2015) (holding that *Comcast* "did not foreclose the possibility of class certification under Rule 23(b)(3) in cases involving individualized damages calculations" and collecting cases). As the Second Circuit concluded in *Roach*, "[p]rior to the Supreme Court's decision in *Comcast*, it was 'well-established' in this Circuit that 'the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification' under Rule 23(b)(3).... We do not read *Comcast* as overruling these decisions." (citations omitted)). This is the law across the Circuits. *See, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988 (11th Cir. 2016) ("[A]s our sister circuits have held since Comcast, 'individual damages calculations do not preclude

class certification.'" (quoting *Neale v. Volvo Cars of N. Am., LLC*, 794 F.3d 353, 374–75 (3d Cir. 2015)) (collecting cases)); *In re Urethane Antitrust Litig.*, 768 F.3d 1245, 1257–58 (10th Cir. 2014) ("*Comcast* did not rest on the ability to measure damages on a class-wide basis."); *In re Deepwater Horizon*, 739 F.3d 790, 815 (5th Cir. 2014) (stating that it is a "misreading of *Comcast*" to interpret it as "preclud[ing] certification under Rule 23(b)(3) in any case where the class members' damages are not susceptible to a formula for classwide measurement"); *Leyva v. Medline Indus. Inc.*, 716 F.3d 510, 514 (9th Cir. 2013) (distinguishing *Comcast* and holding that "the presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)"); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988 (9th Cir. 2015) ("[D]ifferences in damage calculations do not defeat class certification after *Comcast*."); *Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182 (10th Cir. 2023) (same). This case law, which Marriott simply ignores, is fatal to its contention that *Comcast* requires class-wide proof of damages.

### b.    Marriott Parodies Dr. Prince's Methodology

Even putting aside Defendants' legally unsupported interpretation of *Comcast* as mandating a class-wide damages methodology, their argument fails on the facts established below. Absent a *Daubert* challenge, *the* question Defendants raise is whether Plaintiffs have put forward a credible model of how damages will be calculated for the class. As the district court found, Plaintiffs have done so. On this

score, Marriott's "co-movement" arguments misstate what co-movement is, what role it plays in Plaintiffs' benefit of the bargain theory of damages, and what their expert actually tested when she attempted to disprove co-movement. Using an econometric methodology found in the literature and approved by other courts,[36] Dr. Prince employed a multi-step model that demonstrates that customers place less value on staying in a hotel that does not adequately protect data. He then calculated for the bellwether plaintiffs, using common economic modeling methods, how to value the change in market price caused by the downward shift in demand for Marriott hotel rooms in the but-for world where customers were informed of Marriott's inadequate data security. The calculated price premium is an exact measurement of the benefit of the bargain overcharge, the methodology for which Dr. Prince demonstrated is applicable commonly to all class members—although the

---

[36] *See, e.g.*, *Briseno v. ConAgra Foods, Inc.*, 674 F. App'x 654, 657 (9th Cir. 2017) (describing conjoint analysis as a "well-established damages model[]"); *Zarinebaf v. Champion Petfoods USA Inc.*, No. 18 C 6951, 2022 WL 910638, at *5 (N.D. Ill. Mar. 29, 2022) ("A price premium theory based on a conjoint analysis is an acceptable method for computing damages."); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1110 (N.D. Cal. 2018) ("[C]onjoint analysis is widely-accepted as a reliable economic tool …."); *In re Dial Complete Mktg. & Sales Pracs. Litig.*, 320 F.R.D. 326, 331 (D.N.H. 2017) ("[C]onjoint analysis is a well-accepted economic methodology."); *Miller v. Fuhu Inc.*, No. 2:14-CV-06119-CAS-AS, 2015 WL 7776794, at *21 (C.D. Cal. Dec. 1, 2015) (stating that "numerous courts … have accepted" conjoint analyses "as reliable methodologies for calculating price premiums on a classwide basis in consumer class actions").

calculations have not yet been run for all class members because Marriott has not produced their data.

Dr. Prince showed—to the satisfaction of the district court and the court's own independent expert, using methodology not challenged on this appeal—that a class-wide calculation of damages was entirely feasible. Specifically, for each market he:

> ➢ Identified Marriott's competitor hotels. JA1203. Dr. Prince used a maximum of nine competitors, based on his knowledge and review of the industry, and consistent with Marriott's internal pricing group that uses the same approach. *Id.*

> ➢ 

> ➢ Calculated the market share for the "outside option," which measures the statistical probability that a customer would choose to stay somewhere other than the hotels within the competitor set. JA1203.

> ➢  JA2735, at ¶ 45.[37]

> ➢ JA2738–39, at ¶ 51.

In implementing the above methodology, Dr. Prince also factored in the results of a conjoint survey undertaken by expert Sarah Butler (whom Marriott did

---

[37] JA2734–37, at ¶¶ 44-49.

not move to exclude). JA1199–1200. Ms. Butler's survey asked participants a series of questions to determine their trade-offs across various hotel features, including price. JA1200. The survey proved that customers had less willingness to pay for staying in a hotel that does not adequately protect data. *Id.*

To put this in economic terms, the survey shows that demand (and hence prices) for Marriott rooms dropped where the hotel did not adequately protect data, holding all else (e.g., prices, hotel features) unchanged. *Id.*; *see also* JA1203; *cf.* JA1200, n.9 ("Dr. Prince appropriately relied on Ms. Butler's findings in developing his overpayment model."). On this basis, Dr. Prince was able to calculate an overcharge percentage. *Id.* His equation requires only that he identify the Marriott hotel for the stay, historical prices and features for the Marriott hotel and hotels surrounding it, the class member who stayed in the Marriott hotel, the price that the class member paid, and the dates of the stay.[38] *Id.*

On this appeal, Marriott takes no issue with the above core steps in Dr. Prince's model. Its sole challenge with regard to class certification is that Dr. Prince relied on "co-movement" assumptions that it claims are unsustainable. Marriott does not explain why this merits issue is a matter for class certification rather than cross-

---

[38] ███████████████████████████████████████████
█████████████████████████████████████████████████
        *Id.*

examination. *See Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 568 U.S. 455, 459 (2013) ("Rule 23(b)(3) requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class.") (emphasis in original); *In re JUUL Labs, Inc., Mktg. Sales Pracs. & Prod. Liab. Litig.*, 609 F. Supp. 3d 942, 979 (N.D. Cal. 2022) (stating that arguments regarding the accuracy of an expert's classwide damages model "do not undermine predominance or raise *Comcast* fit issues. They can be raised on cross-examination and argued to the trier or fact.").

For class certification purposes, the only relevant consideration is whether this is a methodology that can be used across the class. On inspection the term "co-movement" is, as Dr. Prince explained at his deposition, ███████████████ ███████████████████████████████████████████████ ███████████████████████████████ JA2927, at 360:7-14. Dr. Prince relied on a leading academic model that, based on detailed empirical study of the hotel industry, concluded that, "[w]e see strong co-movement in the prices of the seven [leading] hotels...."[39]

---

[39] Sungjin Cho, Gong Lee, John Rust, and Mengkai Yu, *Optimal Dynamic Hotel Pricing*, Working Paper, 2018, at 23, available at https://economics.sas.upenn.edu/index.php/system/files/2018-04/hp_final_update.pdf.

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████  JA2733, at ¶ 43 (quoting Cho, *et al*.). The district court properly credited Dr. Prince's reliance on this paper in its *Daubert* order, noting that Dr. Prince based his co-movement "assumption on a working paper published by four economists (at least one of whom, John Rust, is highly respected amongst economists)." JA1206; *see also* JA1202, n.14 ("It is a sophisticated study of the hotel industry showing that hotel prices reflect co-movement[.]").

Having not challenged Dr. Prince's methodology on this appeal, Marriott resorts to nitpicking the expert analysis—methodology credited by the district court based on a full record and the court's own appointed expert. Putting aside the discrete challenges to applications not yet run, Marriott is left to claim that its own expert, Dr. Catherine Tucker, appropriately "tested" co-movement and disproved Dr. Prince's use of it. But Dr. Tucker did not test co-movement as defined by the literature and Dr. Prince; rather, she tested whether "the most expensive hotel remained the most expensive, by the same amount, even as the overall price rose and fell." Marriott Br. at 58. But that is a straw man, not co-movement: as the Cho paper

and Dr. Prince explained, co-movement assesses whether there are ███████

██████████████████████████████████████████████████████████

███████████████████████████████ JA2733, at ¶ 43. Most centrally,

however, a battle of approved experts is for the merits trial, not an error at class

certification.

Finally, the only *Comcast* decision that Marriott cites, *In re Rail Freight Fuel*

*Surcharge Antitrust Litig.*, 725 F.3d 244, 253 (D.C. Cir. 2013), supports Plaintiffs.

Marriott cites the case for the proposition that under *Comcast*, "district courts [must]

delve into the intricacies of the plaintiffs' damages model…." Marriott Br. at 51.

That is exactly what the district court did here, in a careful and thorough analysis

(incorporating the assistance of an outside economist) that upheld Dr. Prince's

methodology. By contrast, the "questionable model" in *In re Rail Freight Fuel*

*Surcharge Antitrust Litigation* concerned an expert's damages model that yielded

false positives and therefore could not be relied upon for the class's theory of harm.

725 F.3d at 253. Dr. Prince's model contains no such issues and, as Marriott omits,

██████████████████████████████████████████████████████████

██████████████████████ JA2739, at Fig. 1. ███████████████████

████████████████████████████████████ *Id.* This is precisely what

Dr. Prince could and would do for all class member stays once Marriott produces its

entire database instead of just those stays related to the bellwether plaintiffs.

In short, Marriott has raised no viable *Comcast* argument. Its arguments are legally flawed, and its attacks on Dr. Prince are meritless, as underscored by Marriott's own decision not to raise a *Daubert* challenge.

## CONCLUSION

For the reasons stated above, the class certification order should be affirmed.

Dated: April 18, 2024

Robert Klonoff
10101 S. Terwilliger Boulevard
Portland, Oregon 97219
503.702.0218
klonoff@usa.net

James J. Pizzirusso
**Hausfeld, LLP**
888 16th St NW Suite 300
Washington, DC 20006
202.540.7200
jpizzirusso@hausfeld.com

Respectfully Submitted,

*/s/ Samuel Issacharoff*

Samuel Issacharoff
40 Washington Sq.
New York, NY 10012
212.998.6580
si13@nyu.edu

*Appellate Counsel*

Andrew N. Friedman
**Cohen Milstein, PLLC**
1100 New York Ave NW 5th Floor
Washington, DC 20005
202.408.4600
AFriedman@cohenmilstein.com

Amy Keller
**DiCello Levitt LLP**
10 N Dearborn St., 6th Floor
Chicago, IL 60602
312.214.7900
akeller@dicellolevitt.com

*Co-Lead Counsel*

Jason L. Lichtman
**Lieff Cabraser Heimann &
Bernstein, LLP**
250 Hudson St., 8th Floor
New York, NY 10013
212.355.9500
jlichtman@lchb.com

*Executive Committee Member*

84

## UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 24-1064(L)    **Caption:** Peter Maldini v. Marriott International, Incorporated

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ___20,876___ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; **or**

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) Samuel Issacharoff _____

Party Name Appellee _____

Dated: 4/18/2024 _____